**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALFAMODESS LOGISTICS, LLC,** | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | **CIVIL ACTION** |
| **CATALENT PHARMA SOLUTIONS, LLC,** | : | |
| *Defendant and Counterclaim &* | : | |
| *Third Party Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| **ALFAMODESS LOGISTICS, LLC,** | : | **No. 09-3543** |
| *Counterclaim Defendant, and* | : | |
| **MARK ODESSA** *and* | : | |
| **STEPHAN THOMAS NAREWSKI,** | : | |
| *Third Party Defendants*. | : | |

**O P I N I O N**

PRATTER, J.                                                                SEPTEMBER 11, 2014

This litigation represents a long haul over bumpy roads by drivers determined to forego every rest stop.[1] After five years of hard driving, two abortive settlement conferences, and attorneys' fees rivaling many long-haul truckers' annual mileage,[2] the parties have reached the final weigh station—or perhaps runaway truck ramp: this Court's resolution, by bench trial, of their claims against each other.

---

[1] They also crossed state lines: this Court has diversity jurisdiction under 28 U.S.C. § 1332 because Catalent Pharma Solutions, LLC, is a Delaware corporation with its principal place of business in Somerset, NJ; AlfaModess Logistics, LLC, is a Pennsylvania limited liability company, Notice Removal ¶¶ 10-14 (Docket No. 1); and Messrs. Odessa and Narewski are Pennsylvania citizens, Catalent Compl. ¶¶ 2-3 (Docket No. 1, Civil Action No. 10-3104 (consolidated)); Answer ¶¶ 2-3 (Docket No. 4, Civil Action No. 10-3104 (consolidated)). The amount in controversy is well in excess of $75,000.

[2] *See AlfaModess Logistics, LLC v. Catalent Pharma Solutions, LLC*, No. 09-3543, 2013 WL 1795459, at *2 & n.3 (E.D. Pa. Apr. 29, 2013) ("The AlfaModess Parties agree that they owe Messrs. Saltz and Matkov nearly $100,000 in unpaid fees.").

## THE ROAD VIEWED FROM CRUISING ALTITUDE[3]

In short: This case is about the nature and the breakdown of the relationship between Catalent Pharma Solutions ("Catalent")[4] and AlfaModess Logistics, LLC ("AlfaModess"), and which entities should be left holding the bill. Catalent was in the business of shipping pharmaceutical products by truck to its customers. AlfaModess, from at least March 2007 through April 2008, was the primary transportation broker to which Catalent turned to find trucks to transport products into and out of its facility. Catalent also paid AlfaModess for brokerage services for freight transportation provided between January 2006 and March 2007.

For the brokerage services it had performed between March 2007 and April 2008, however, AlfaModess in many instances submitted to Catalent invoices demanding payment many months after the products had been transported and even though the corresponding bills of lading had been marked "collect," an industry standard provision that the recipient, rather than the shipper, of the freight was responsible for payment. Although for a period of time Catalent had paid such invoices, Catalent subsequently refused to pay many of these invoices. The dispute over the proper payment of these invoices escalated as Catalent first indicated that AlfaModess should seek payment for "collect" invoices from Catalent's customers and suggested that, "when appropriate," it would help AlfaModess do so. AlfaModess then wrote Catalent's customers that

---

[3] Specific findings of fact, with citations to the record, follow in the next section. When the parties agree on a proposed finding of fact, the proposed findings are occasionally cited instead of the record. *See* Catalent's Proposed Findings of Fact and Conclusions of Law (Docket No. 167) (hereinafter "Catalent's Proposed Findings and Conclusions"); Plaintiff and Third-Party Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law (Docket No. 166) (hereinafter "AlfaModess's Proposed Findings and Conclusions"). Citations to the transcripts refer to proceedings held on March 4, 2014, in the morning ("Day 1 AM Tr. N.T."; Docket No. 162), afternoon ("Day 1 PM Tr. N.T."; Docket No. 163); March 5, 2014 ("Day 2 Tr. N.T."; Docket No. 164); and March 6, 2014 ("Day 3 Tr. N.T."; Docket No. 165).

[4] A fact irrelevant to the result in this case, but important for review of the record, is that Catalent has been known by other names, such as Cardinal Health, at different points in time. *E.g.*, Day 2 Tr. N.T. 59:24–60:19 (Ligato cross).

Catalent had stated that the customers were responsible for the payments, at which point Catalent then wrote to its customers to state instead that billing issues were to be determined by AlfaModess and the customer.

Also relevant to the two companies' relationship is the relationship between two men. In January 2006, AlfaModess, at most ever a two-man shop, was founded by Mark Odessa, who had previously been a security guard at Catalent's shipping docks, where he met Stephan (Steve) Thomas Narewski, Catalent's logistics supervisor who oversaw shipping and receiving. As time went on, these two men developed a relationship that included Mr. Narewski's renting one of the apartments from Mr. Odessa's duplex.

The dispute in this case is almost entirely factual rather than legal. Determining what actually occurred resolves the parties' claims against each other. Although the scope of the parties' claims has varied throughout this litigation, the parties' closing arguments and proposed conclusions of law have narrowed the claims as follows: AlfaModess, per Mr. Odessa, first claims that Catalent breached its implied contract with AlfaModess by refusing to pay invoices for brokerage services provided between March 2007 and April 2008; in the alternative, AlfaModess claims that Catalent has been unjustly enriched. Second, AlfaModess claims that Catalent committed fraud by promising that it would assist AlfaModess in collecting payment for "collect" shipments from Catalent's customers but instead telling its customers that no such payments might be owing.

Although Catalent challenges the creation or proof of an implied contract at all, under Catalent's version of events, AlfaModess is the fraudster that owes *Catalent* money. The parties stipulated that Catalent actually paid AlfaModess $1,763,516 between January 2006 and May

2008;[5] the bulk of these payments was for brokerage services on freight hauled between January 2006 and March 2007. Catalent claims that from January 2006 to March 2007, East Coast Transport & Logistics ("East Coast" or "ECTL") was its shipping primary broker, not AlfaModess, and that Mr. Narewski devised as fraudulent scheme with Mr. Odessa whereby after receiving East Coast's invoices, Mr. Narewski would forward them to AlfaModess for generation of new invoices that would be sent back to Catalent for payment as if AlfaModess had performed the services. Catalent claims that things continued this way until August 2006, when East Coast was instructed to begin billing Catalent at AlfaModess directly, although AlfaModess continued to perform no work. (AlfaModess's version of events is that East Coast was *AlfaModess's* primary "cobroker," or, in other words, its "subcontractor"). Based on this alleged fraudulent scheme, Catalent claims fraud against AlfaModess and against Messrs. Odessa and Narewski, conversion against AlfaModess and Mr. Odessa,[6] civil conspiracy by all three, and aiding and abetting against Mr. Narewski. In the alternative, Catalent claims unjust enrichment against AlfaModess and Mr. Odessa.[7]

Catalent further claims that in March 2007, Mr. Narewski instructed his dock schedulers to change the "house" broker for Catalent from East Coast to AlfaModess and that, of course, nobody at Catalent knew of the scheme he and Mr. Odessa had perpetrated. Thus, Catalent asserts, any contract, even if otherwise proven, would be invalid for fraud in the factum. Finally, in defense of the AlfaModess allegations, Catalent denies that it committed fraud by failing to assist AlfaModess in the latter's collection of payment from Catalent's customers. Catalent

---

[5] Stipulations Agreed Upon by All Parties ¶ 7 (Docket No. 147) (hereinafter "Stipulations").

[6] Catalent's Proposed Findings and Conclusions 57 n.6.

[7] Catalent's Proposed Findings and Conclusions 53 n.5.

argues, primarily, that its statement was a gratuitous gesture and that AlfaModess cannot, in any event, establish any of the elements of fraud.

The Court held a bench trial from March 4 through March 6, 2014. After careful consideration of the evidence presented, the Court concludes that Catalent's version of events should be credited in substantial part. Pursuant to Federal Rule of Civil Procedure Rule 52(a)(1), the Court makes the following findings of fact and conclusions of law.[8]

## FINDINGS OF FACT[9]

Catalent Pharma Solutions, LLC, produced packaged pharmaceutical products[10] that it shipped to its customers from its facility at Red Lion Road in Philadelphia, Pennsylvania, where it also received its supplies.[11] As a shipper, Catalent needed for-hire motor carriers (i.e., trucks)[12] that could handle various types of loads because its pharmaceutical products were often subject to time, temperature, or other truck constraints;[13] sometimes Catalent had to make similar

---

[8] *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

[9] Citations to the transcript are to Day 1 AM or PM (March 4, 2014); Day 2 (March 5, 2014), or Day 3 (March 6, 2014). Exhibits are cited simply as "P-*n*" or "D-*n*," where the number *n* corresponds to the exhibit as it was introduced at trial and the way to which it is referred in the transcripts (the parties' references to exhibits in their proposed findings of fact, by contrast, do not consistently refer to exhibits by these numbers).

[10] AlfaModess's Proposed Findings and Conclusions ¶ 5, at 2; Catalent's Proposed Findings and Conclusions ¶¶ 1, 8, at 1-2.

[11] AlfaModess's Proposed Findings and Conclusions ¶ 9, at 2; Catalent's Proposed Findings and Conclusions ¶ 1, at 1.

[12] "The term 'motor carrier' means a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

[13] *See, e.g.*, Day 2 Tr. N.T. 52:14–53:6 (Ligato direct).

arrangements to receive shipments.[14] When Catalent's customers or suppliers did not ask Catalent to use a particular motor carrier, Catalent would turn to a "house," or default, freight broker[15] to find, at the cost of some markup, a suitable carrier to deliver the goods.[16]

**Co-broker or No Broker? The East Coast Phase, January 2006 to March 2007**

Stephan (Steve) Thomas Narewski, who was Catalent's shipping and receiving supervisor,[17] supervised Catalent's three dock schedulers, namely, Mark Ligato, Heriberto "Macho" Garcia, and Kathy Bannan,[18] who were responsible for communicating with carriers and the house broker regarding freight transportation.[19] According to the consistent testimony of all three dock schedulers—testimony that the Court credits—from January 2006 to about March

---

[14] Day 2 Tr. N.T. 80:5-19 (Ligato cross), 114:13-19 (Garcia direct) ("Inbound I would say about three or four times, something like that" that a dock scheduler would have to specify a carrier).

[15] *See, e.g.*, 49 U.S.C. § 13102(2) ("The term 'broker' means a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."); 49 C.F.R. § 371.2(a) ("'Broker' means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier.").

[16] Day 2 Tr. N.T. 66:17-25 (Ligato cross); *see also supra* notes 13 and 14 and accompanying text. On brokers generally, see Day 3 Tr. N.T. 49:20–54:15, 58:1-14 (Milone).

[17] AlfaModess's Proposed Findings and Conclusions ¶ 6, at 2; Catalent's Proposed Findings and Conclusions ¶¶ 10, 13, at 3; Day 1 AM Tr. N.T., 116:11-16 (Odessa direct); Day 1 PM Tr. N.T., 44:14-18 (Odessa cross).

[18] AlfaModess's Proposed Findings and Conclusions ¶ 7, at 2; Catalent's Proposed Findings and Conclusions ¶¶ 12, at 3.

[19] Catalent's Proposed Findings and Conclusions ¶ 12, at 3; AlfaModess's Proposed Findings and Conclusions ¶ 15(a), at 3.; Day 2 Tr. N.T. 45:7–49:22 (Ligato direct), Day 2 Tr. N.T. 66:17-25 (Ligato cross), 109:22–110:2, 113:16–114:19 (Garcia direct), 206:8–207:11 (Bannan direct).

2007, by Mr. Narewski's direction, Catalent's house broker was East Coast Transport and Logistics ("East Coast"), which they would call whenever a load had to be transported.[20]

Thus, for example, Mr. Ligato testified that "when [Mr. Narewski] came aboard, [Catalent] used East Coast"[21] and that when Mr. Ligato would call East Coast to order a load, he would speak sometimes to Jerry Snyder or a "girl in the office."[22] Mr. Ligato called East Coast "a lot"[23]—"at least" 10 or 20 times per week, for 70 or 80 percent of the calls to arrange for transportation;[24] Mr. Garcia testified that he would call East Coast "about 80 percent" of the time[25] or, perhaps, "seven or eight times" per week.[26] Afterwards, Mr. Ligato would sometimes email Mr. Narewski to tell him that he "called east [sic] Coast" to arrange such shipment.[27] Similarly, Mr. Narewski would sometimes notify Mr. Ligato by email that, for instance, "[e]arly in the morning an East Coast truck will probably be in to pick up seven pallets."[28] Accordingly, hundreds if not thousands of times overall, Mr. Ligato or another dock scheduler would write "East Coast" in the "Carrier" box on the bills of lading to go with the truck,[29] and East Coast

---

[20] *See supra* note 19; *see also* Day 2 Tr. N.T. 208:8-24 (Bannan direct).

[21] Day 2 Tr. N.T. 57:1-2 (Ligato direct).

[22] Day 2 Tr. N.T. 57:6-10 (Ligato direct).

[23] Day 2 Tr. N.T. 57:21-23 (Ligato direct).

[24] Day 2 Tr. N.T. 69:20–70:7 (Ligato cross).

[25] Day 2 Tr. N.T. 112:13-17 (Garcia direct).

[26] Day 2 Tr. N.T. 113:16-18 (Garcia direct).

[27] D-5 (October 27, 2006 email from Mr. Ligato to Mr. Narewski); *see also, e.g.*, D-8 (November 7, 2006 email from Mr. Ligato to Mr. Narewski); D-14 (February 15, 2007 email from Mr. Ligato to Mr. Narewski); D-16 (March 6, 2007 email from Mr. Ligato to Mr. Narewski) ("Steve I call East Coast for 2 trucks."); Day 2 Tr. N.T. 70:14–71:5, 72:24–73:8 (Ligato cross).

[28] D-9 (January 3, 2007 email from Mr. Narewski to Mr. Ligato).

[29] D-47 (composite exhibit); Day 2 Tr. N.T. 74:13–76:18 (Ligato cross).

would be identified as the "Carrier" on Catalent's inbound and outbound shipping logs.[30] East

Coast would then bill Catalent by sending invoices to Catalent at the Red Lion Road facility,[31]

according to the testimony of Debbie Wigmore, who worked in credit and collections at East

Coast.[32] Indeed, all the parties to the instant lawsuit stipulated that East Coast "sent invoices

directly to [Catalent's Red Lion Road facility] 413 times from January of 2006 to August 14,

2006."[33]

Then something curious occurred: on August 18, 2006, Ms. Wigmore "received this [fax]

from Mr. Snyder [(who worked on the Catalent account as an independent contractor from a

different location)], saying, Debbie, change the bill[-]to code to say Cardinal Health [Catalent] in

care of AML," which is "what [she] did." From that point on, "the bills started to go [to a

Hatboro P.O. box belonging to AlfaModess Logistics, LLC] for payment."[34] And, indeed, all

parties stipulated that East Coast "sent invoices to '[Catalent] c/o ALM . . . PO Box 495, Hatboro

Pa.' 246 times from August 18, 2006 to March 16, 2007."[35] At the time, Ms. Wigmore believed

that AlfaModess, or "ALM," was "[a] freight payment company"—"that is where we were

sending the bills to and they were sending us wires to pay for the bills that we were sending

---

[30] D-25 (outbound shipping log); D-25 (inbound shipping log); Day 2 Tr. N.T. 76:19–79:24 (Ligato cross).

[31] Day 3 Tr. N.T. 29:15-16 (Wigmore direct); *see* D-38 (spreadsheet compiled by Ms. Wigmore); D-37 (computer printout). *See generally* Day 3 Tr. N.T. 22:1–24:11 (explaining the relationship of exhibits 37 and 38 and 39 and 40).

[32] Day 3 Tr. N.T. 5:14-21 (Wigmore direct).

[33] Stipulations ¶ 1.

[34] Day 3 Tr. N.T. 29:12–30:24 (Wigmore direct). The fax is D-42. The Court credits Ms. Wigmore's testimony that the fax was sent on August 18, 2006, rather than any insinuation that it was sent on August 18, 2007, as the fax printout at the bottom of the page appears to mistakenly show—even under AlfaModess's implausible version of the facts, AlfaModess was no longer using East Coast as a cobroker in August 2007. *See* Day 3 Tr. N.T. 41:24–42:22.

[35] Stipulations ¶ 2.

them," and "[t]here are a lot of freight payment companies that pay freight bills for our customers."[36] As Ms. Wigmore further explained, "Normally, [East Coast] would not send [bills] to another broker, but [rather] would send [bills] to a freight payment company who pays the bills for [East Coast's] customer."[37]

But Ms. Wigmore was mistaken. As several post-August 18, 2006 exhibits show, East Coast would send an invoice for a particular shipment, along with the corresponding bill of lading, to "CARDINAL HEALTH / C/O A M L / P O BOX 195 / HATBORO, PA 19040."[38] "A M L" was AlfaModess Logistics, LLC, the Plaintiff and Counterclaim Defendant in this lawsuit. The "Invoice #" and shipping destination on each of East Coast's invoices correspond, respectively, to the "Reference" number and shipping destination on accompanying, but later-issued, AlfaModess invoices sent to "CARDINAL HEALTH / 3001 RED LION RD / PHILADELPHIA, PA."[39] AlfaModess was not simply remitting payment to East Coast on Catalent's behalf, as Ms. Wigmore believed. Rather, AlfaModess was marking up the bills from, for example, $1,195 to $2600; $900 to $1270; and $675 to $2,420, in corresponding, "dummy" invoices that it was producing and sending on to Catalent (and which Catalent was paying).[40] Still, Ms. Wigmore evidently also believed that Catalent, and not AlfaModess, was East Coast's direct customer. On September 27, 2006, for instance, she faxed Mr. Narewski at Catalent to inform him that certain "invoices [had been] paid twice on the same wire."[41]

---

[36] Day 3 Tr. N.T. 31:23–32:22 (Wigmore direct).

[37] Day 3 Tr. N.T. 46:23–47:3 (Wigmore by the Court).

[38] D-44 at 1 (dated October 18, 2006); D-45 at 1 (dated September 19, 2006); D-46 at 1 (dated March 16, 2007).

[39] *See* D-44 at 1, 5; D-45 at 1, 5; D-46 at 1, 4.

[40] *See* D-44; D-45; D-46.

[41] D-43; Day 3 Tr. N.T. 31:7–17 (Wigmore direct).

**Evidence of a Fraud, or, How a Broker was Broken**

What was actually going on? In short, Mark Odessa, who founded AlfaModess, had teamed up with Mr. Narewski, the inside man, to concoct a scheme to defraud Catalent by rerouting East Coast invoices, sent by East Coast to Catalent, to AlfaModess for markup and reissuance such that AlfaModess would thereby claim to have done the brokerage work for Catalent. And when Ms. Wigmore received the August 18, 2006 fax to send future East Coast invoices to an "ALM" P.O. box, the two men had removed one of the steps and helped to hide the evidence. Notwithstanding the dock schedulers' and Ms. Wigmore's consistent testimony, AlfaModess continues to claim, through Mr. Odessa—the only person whose testimony supports its position—that East Coast was never Catalent's house broker, because it was instead AlfaModess that "began providing freight brokerage services to Catalent in February 2006"; AlfaModess, in turn, "worked with other freight brokerage companies, such as East Coast."[42]

Mr. Narewski and Mark Odessa met in 2004 at Catalent's Red Lion Road facility while Mr. Odessa was assigned to the facility as a security guard[43] with duties that included "observ[ing] and control[ling the] situation at [the] shipping dock."[44] As Ms. Bannan (a Catalent dock scheduler)[45] explained, she was able, through the big window between the shipping office in which she sat and the truckers' lounge, to observe the two men, who appeared to be friendly, "frequent[ly]" meeting alone in the truckers' lounge[46] and, according to Mr. Garcia, closing the

---

[42] AlfaModess's Proposed Findings and Conclusions ¶¶ 14, 16, 24, at 3-5; Day 1 PM, 12:17-21 (Odessa direct).

[43] Day 1 PM Tr. N.T. 40:16-23 (Odessa cross).

[44] Day 1 AM Tr. N.T. 116:2-7 (Odessa direct).

[45] Ms. Bannan has since married. Her surname is now Butler.

[46] Day 2 Tr. N.T. 206:21–207:4 (Bannan direct).

lounge's sliding glass window.[47] Ms. Bannan further reflected, "Security was not part of Mr. Narewski's role to supervise and/or guide. [Security] was an outside service that Catalent had. So they were really outside of our realm. And to see it that frequent, it [the personal interaction between Messrs. Odessa and Narewski] was just strange. Nobody else interacted that much even on daily business."[48] Mr. Odessa, by contrast, attempted to downplay the closeness of his relationship with Mr. Narewski by calling it "formal, like with any other worker at [Catalent's] facility." And although he acknowledged that he and Mr. Narewski would sometimes have lunch or play chess together in the truckers' lounge, he claimed they would only do so while others were present.[49] Mr. Odessa claims that it was not until "later when East Coast Transport and Logistics filed [a] claim against AlfaModess, including [Mr. Odessa] and Steve Narewski, [that the two] finally became more friendly and connected."[50] Mr. Odessa went so far as to testify that, up through January 2006, he did not know what Mr. Narewski did for Catalent.[51]

The Court credits Ms. Bannan's version. Mr. Odessa's testimony is questionable on a number of counts because it is both inconsistent with the dock schedulers' and in internal tension with itself. By Mr. Odessa's own admission, from sometime in 2005 until sometime in 2013, Mr. Narewski rented one of the apartments in Mr. Odessa's duplex,[52] and the two had only a verbal agreement—there was no signed lease—and Mr. Odessa did not ask Mr. Narewski any information about his employment to verify his ability to pay rent "because [Mr. Odessa] kn[e]w

---

[47] Day 2 Tr. N.T. 117:10-22 (Garcia cross).

[48] Day 2 Tr. N.T. 209:11-17 (Bannan direct).

[49] Day 1 AM Tr. N.T. 117:11-17 (Odessa direct); Day 1 PM Tr. N.T. 44:19-24, 46:16-20 (Odessa cross).

[50] Day 1 PM Tr. N.T. 47:1-12 (Odessa cross).

[51] Day 1 PM, 47:23–48:6  (Odessa cross).

[52] Day 1 AM Tr. N.T. 117:25–118:19 (Odessa direct).

he ha[d a] permanent job and [] believe[d] he was appropriate[ly] compensated as manager—I mean, supervisor."[53] Given Ms. Bannan's testimony and their living arrangements, Mr. Odessa's testimony that he did not talk much with or know much about Mr. Narewski even after Mr. Narewski became Mr. Odessa's tenant[54] rings hollow.

Moreover, Mr. Odessa had every reason and opportunity to know precisely what Mr. Narewski did for a living, because, in fact, he was a soon-to-be freight broker himself. Mr. Odessa claims that he began AlfaModess, a freight brokerage company–to-be, in October 2004 while he was still working as a security guard at Catalent (he was laid off by Haban Security sometime in 2006).[55] (AlfaModess obtained a federal transportation broker's license at the beginning of 2006;[56] before that time, AlfaModess asserts that it worked merely as a "scout" on commission.[57]) Mr. Odessa began AlfaModess because, he maintains, he "found out after multiple years working . . . with truck drivers that [there] exists a specific demand and work to provide transportation services,"[58] and he learned how to perform these services from his observation of truck drivers—at Catalent's facility—"plus of course Internet resources."[59] And, as Mr. Odessa himself claimed, he—like many transportation brokers looking for business[60]— would often target a logistics supervisor or manager at a shipping company.[61] After all, these are the people usually positioned to direct how a shipper fulfills its transportation needs, and this

---

[53] Day 1 PM Tr. N.T. 55:23–56:6 (Odessa cross).

[54] Day 1 PM Tr. N.T. 47:13-22 (Odessa cross).

[55] Day 1 AM Tr. N.T. 119:12–120:4 (Odessa direct).

[56] Day 1 AM Tr. N.T. 121:13-15 (Odessa direct).

[57] *See* AlfaModess's Proposed Findings and Conclusions ¶ 12, at 3.

[58] Day 1 AM Tr. N.T. 120:6-8 (Odessa direct).

[59] Day 1 AM Tr. N.T. 122:11-16 (Odessa direct).

[60] *E.g.*, Day 3 Tr. N.T. 53:3-15 (Milone direct).

[61] Day 1 PM Tr. N.T. 54:4-12 (Odessa cross).

method is what he taught to Mr. Kuri, his employee from 2007 to 2008.[62] But despite being on the lookout for business and targeting logistics supervisors, Mr. Odessa, who frequently met alone with Mr. Narewski, claimed under oath that he was unaware of Mr. Narewski's responsibilities and did not know that Mr. Narewski was responsible for engaging the trucking companies for Catalent and, furthermore, that he supposedly never asked.[63] In the words of Catalent's attorneys, "Despite Odessa: (a) working in the same area as Narewski, (b) eating lunch and playing chess with Narewski, and (c) having Narewski as a tenant in his duplex, Odessa testified that he never asked Narewski for any business."[64] Mr. Odessa's implausible story is that notwithstanding all of these circumstances, up through January 2006, he simply did not know what Mr. Narewski did for Catalent.[65]

In any event, Mr. Odessa claims that AlfaModess secured Catalent's business in January 2006 such that it, and not East Coast, was Catalent's house broker. Mr. Odessa's version of events, East Coast was a broker to whom AlfaModess turned to cobroker Catalent's shipments.[66] According to Mr. Odessa, in January 2006, AlfaModess secured its first load with Catalent either—he is "not sure"—from a posting on an Internet load board or by telephone (and not, that is, from his budding friendship with Mr. Narewski).[67] Then, he claims, people from Catalent would call him to place orders. Most of the time a "Steve" would call[68]—though Mr. Odessa did

---

[62] Day 1 AM Tr. N.T. 82:3–84:12 (Kuri cross).

[63] Day 1 PM Tr. N.T. 54:13–55:22 (Odessa cross).

[64] Catalent's Proposed Findings and Conclusions ¶ 18, at 4.

[65] Day 1 PM Tr. N.T. 47:23–48:6 (Odessa cross).

[66] *E.g.*, Day 1 PM Tr. N.T. 76:18–78:7 (Odessa cross).

[67] Day 1 PM Tr. N.T. 71:23–72:5 (Odessa cross).

[68] Day 1 PM Tr. N.T. 74:16-18 (Odessa cross).

not know "it was actually Steve Narewski [until] much later."[69] At other times, other unidentified individuals supposedly would call, although he could not remember their names but did not think the callers were Mr. Ligato, Mr. Garcia, or Ms. Bannan,[70] individuals with whom Mr. Odessa was familiar from his time as a security guard at Catalent[71] and who all testified that they were, in fact, the people calling East Coast (and not AlfaModess).[72] After he got the order from Catalent, Mr. Odessa claims, he would simply turn around and call East Coast to do the actual work of brokering.[73] And who answered the phone at East Coast? "[I]t was a person who actually named herself [sic] Steve," but, again, not Steve Narewski.[74] (Mr. Odessa could produce no records to support this story,[75] and AlfaModess's only other employee, Philip Kuri, saw nothing during his time at AlfaModess to indicate that East Coast had ever been contacted by AlfaModess.[76]) Then, Mr. Odessa claims, East Coast would send AlfaModess the invoices, some of which were initially sent directly to Catalent by "mistake."[77]

---

[69] Day 1 PM Tr. N.T. 71:8-12 (Odessa cross).

[70] Day 1 PM Tr. N.T. 72:21–73:16 (Odessa cross).

[71] Day 1 PM Tr. N.T. 44:2-12 (Odessa cross).

[72] Mr. Odessa's testimony is somewhat inconsistent even with that of Mr. Kuri, his former employee. Mr. Kuri testified that his job at AlfaModess (from February through November 2008, after East Coast was out of the picture) consisted of receiving transportation requests from Catalent and finding suitable transportation solutions. Day 1 AM Tr. N.T. 47:5-12 (Kuri direct). He communicated with several Catalent employees: Mark Ligato, Heriberto Garcia, and Steve Narewski, Day 1 AM Tr. N.T. 48:10-18 (Kuri direct), who would sometimes call him but would ultimately place orders for Catalent by sending AlfaModess order forms. *E.g.*, Day 1 AM Tr. N.T. 48:19–54:8 (Kuri direct).

[73] Day 1 PM Tr. N.T. 76:18-23 (Odessa cross).

[74] Day 1 PM Tr. N.T. 77:5-14 (Odessa cross).

[75] Day 1 PM Tr. N.T. 77:24–78:14 (Odessa cross).

[76] *See infra* notes 113–116 and accompanying text.

[77] Day 1 PM Tr. N.T. 78:21–79:19 (Odessa cross).

Mr. Narewski, despite being present for the entire trial, did not testify. But the evidence implicates him, as well. He was, after all, Catalent's logistics supervisor who, according to the dock schedulers' consistent testimony, instructed them to use East Coast in 2006 and only later, in 2007, instructed them to use AlfaModess.[78] Further, under Catalent's standard operating procedure at the time, according to Jeffrey Kimmler, a Catalent accountant, incoming invoices for transportation services were redirected to Mr. Narewski,[79] by whose signature hundreds of payments to AlfaModess—for work done by East Coast—were approved.[80] It was he who in April 2007, when lawyers for Catalent were investigating potential legal claims by East Coast that resulted from the scheme (as explained in greater detail below), maintained that "[a]t no point has [East Coast] had direct business with [Catalent], they served as a subcontractor for [AlfaModess], a third party logistics provider that serves [Catalent] and our customers."[81] It was he who had a friendship with Mr. Odessa and knew that Mr. Odessa, Catalent's former security guard, ran AlfaModess, but who did not disclose this fact, apparently, to anyone at Catalent.[82] And it was he who began using a shredder with greater frequency just before he was fired.[83]

Is there any other plausible (let alone reasonable) benign explanation for the discrepancies in the parties' stories? Quite simply, the documented events are only possible under circumstances of collusion. Assume, for sake of argument, that a reasonable noncolluding Catalent shipping supervisor received East Coast invoices a handful of times by "mistake" (as

[78] *See infra* note 89 and accompanying text.

[79] Day 2 Tr. N.T. 173:12-16 (Kimmler direct).

[80] Day 2 Tr. N.T. 173:12–175:1 (Kimmler direct); D-47; *see also, e.g.*, D-44 at 4; D-45 at 4.

[81] P-16 (April 24, 2007 email from Mr. Narewski to Catalent attorneys Mikeisha Anderson and Jason Maxwell); *see also* Day 2 Tr. N.T. 146:9–148:23 (Krauss cross).

[82] *See, e.g.*, Day 2 Tr. N.T. 213:23–215:20 (Bannan direct).

[83] *E.g.*, Day 2 Tr. N.T. 103:1-5 (Ligato redirect), 118:2-9 (Garcia cross), 209:22–210:9 (Bannan direct).

Mr. Odessa claimed, notwithstanding all parties' stipulation that East Coast directly sent Catalent invoices on 413 occasions). Such a reasonable noncolluding supervisor would want to know why Catalent's loads were being cobrokered by another broker, because cobrokering (i.e., when one broker brokers for another) is disfavored and rare, especially in a competitive industry in which the standard industry practice is to disclose cobrokering,[84] which, in any event, "is frowned upon, and . . . not accepted because [brokers] are basically being hired to find the trucks."[85] Moreover, as Catalent's expert testified, it is inconceivable that a shipper would be communicating with one broker regarding the work being performed for the shipper by another broker. In fact, were *that* the case, the only conceivable thing preventing the shipper and the broker doing the actual work—in this case, East Coast—from cutting out the redundant middleman would be some kind of contractual noncompete agreement.[86] But AlfaModess has not contended that it had such an arrangement with either Catalent or East Coast, let alone produced evidence of one. The participation of any unnecessary middleman broker necessarily means that both shipper and broker are giving up profits that could otherwise be theirs and is contrary to common business sense. More curiously still, Mr. Ligato and Ms. Bannan—two of the three people who were contacting Catalent's house broker, whether East Coast or AlfaModess—testified that they had never even heard of AlfaModess from January 2006 to March 2007, the period during which Mr. Odessa claims AlfaModess was brokering for Catalent.[87] Instead, all three dock schedulers

---

[84] *E.g.*, Day 3 Tr. N.T. 60:19–61:10 (Milone direct), 79:9–80:7 (Milone cross).

[85] Day 3 Tr. N.T. 60:19–61:10 (Milone direct).

[86] *See, e.g.*, Day 3 Tr. N.T. 60:19–61:10 (Milone direct) (explaining that cobrokering "sets you [the cobroker] up [for failure], because if I'm the broker I have a contract with the carrier not to back-solicit my customer, where when you get to that next list, that next carrier does not have one for you, he has one for his own broker.") .

[87] Day 2 Tr. N.T. 69:16-19 (Ligato cross), 211:23–212:3 (Bannan direct); *see also* Day 2 Tr. N.T. 115:18-21 (Garcia cross) (Mr. Cohen: "With respect to the timing of the use of East Coast

placed calls to East Coast to arrange for transportation, and Mr. Ligato and Ms. Bannan recall sometimes speaking with Jerry Snyder, East Coast's representative on the account.[88]

Such an evolving billing fraud—first a Y (Catalent → East Coast → Catalent (by Narewski) → AlfaModess → Catalent) and then a triangle (Catalent → East Coast → AlfaModess → Catalent) is also the only plausible way to explain other testimony regarding curious occurrences of record. In March 2007, according to the dock schedulers' testimony, Mr. Narewski told them to stop using East Coast and to begin using AlfaModess as the house broker[89]—an instruction only necessary because East Coast, not AlfaModess, was Catalent's default broker. At this point, as Mr. Ligato testified, he sent a test email to an AlfaModess email address—documentary proof of the *initiation* of communications with AlfaModess.[90] Further, the dock schedulers testified that Mr. Narewski was their first supervisor to have a shredder, which he purchased and then used frequently—and especially prolifically just before he was fired in April 2008.[91] The one most plausible overall understanding of Mr. Narewski's activities was that, having received invoices from East Coast, he was faxing or otherwise sending them on to AlfaModess and then destroying the evidence.

---

as compared to AlfaModess, do you agree with everything Mr. Ligato said on that point as well?" Mr. Ligato: "Yes.").

[88] Day 2 Tr. N.T. 57:6-10 (Ligato direct), 70:4-7 (Ligato cross), 211:15-18 (Bannan direct).

[89] Day 2 Tr. N.T. 85:9-20 (Ligato cross), 206:21–207:11 (Bannan direct).

[90] D-72 (March 29, 2007 email from Mr. Ligato to "order@amlwebportal.com" and "pkuri@amlwebportal.com") ("Hi this just a test to see if you get the e mail . Thanks Mark Ligato"); Day 2 Tr. N.T. 86:1-24 (Ligato cross).

[91] *See supra* note 83 and accompanying text; *see also* Day 2 Tr. N.T. 63:15-21 (Ligato cross), 209:18-21 (Bannan direct).

**AlfaModess in the Driver's Seat: March 2007 to April 2008**

In February 2007, according to Mr. Kuri's testimony—and perhaps because Mr. Odessa was preparing for AlfaModess to do some actual work—Mr. Odessa hired Mr. Kuri as AlfaModess's only employee.[92] He got the job because he and Mr. Odessa were friends from 15 or 20 years before, when Mr. Kuri attended a computer school at which Mr. Odessa was a volunteer technician.[93] Before he began, Mr. Kuri received training from Mr. Odessa, and then, on the job, from Mr. Odessa and by Internet research.[94] Mr. Kuri testified that his job consisted of receiving transportation requests from Catalent and finding suitable transportation solutions.[95]

The parties agree that between March 2007 and 2008, Catalent's dock schedulers contacted AlfaModess to make freight transportation arrangements. (AlfaModess's contention of course, is that Catalent's dock schedulers merely continued to contact AlfaModess, not, of course, that Mr. Narewski instructed the dock schedulers in March 2007 that the house broker would cease to be East Coast and become AlfaModess.) Mr. Kuri testified that he communicated with several Catalent employees: Mark Ligato, Heriberto Garcia, and Steve Narewski,[96] who would sometimes call him but would ultimately place orders for Catalent by sending AlfaModess order forms.[97] Mr. Kuri did not, however, quote price terms to Catalent—he was not involved in

---

[92] Day 1 AM Tr. N.T. 45:21–46:1 (Kuri direct), 108:25–109:1 (Kuri cross).

[93] Day 1 AM Tr. N.T. 46:4-5 (Kuri direct); 91:16–92:14 (Kuri cross); Day 1 PM Tr. N.T. 37:8–38:4.

[94] Day 1 AM Tr. N.T. 46:4-5 (Kuri direct); 71:16–72:2 (Kuri cross); 122:7-10 (Odessa).

[95] Day 1 AM Tr. N.T. 47:5-12 (Kuri direct).

[96] Day 1 AM Tr. N.T. 48:10-18 (Kuri direct).

[97] *E.g.*, Day 1 AM Tr. N.T. 48:19–54:8; *see also supra* note 19 and accompanying text.

AlfaModess's billing or invoicing of Catalent,[98] and he did not know what AlfaModess was charging Catalent.[99]

At some point around this time, possibly in March 2007, a curious incident occurred. Ms. Bannan received a call that, based on the voice on the other end of the line, she thought was from "Mark the security guard"—i.e., Mr. Odessa.[100] After hanging up the phone, she remarked aloud that she thought the call was from "Mark the security guard." Mr. Narewski, who heard her comment, suddenly "screamed out, said [']that's not him[']"[101] and was "a little shocked, maybe thrown off guard and then upset. . . . He said that it was not the security guard."[102] Again, Mr. Narewski, despite being present for the entirety of the trial, did not testify to offer his own account of this event or any other.

The only opposing explanations to the consistent accounts of former Catalent employees are Mr. Odessa's, and they, once again, are rather tortured. Mr. Odessa was unable to produce any communications from January 2006 through February 2007 that would show that AlfaModess was actually Catalent's broker that, in turn, was subcontracting with East Coast.[103] This is notwithstanding the facts that (1) Mr. Odessa produced numerous communications with Mr. Narewski and Catalent's dock schedulers for the time period during which, the parties do not

---

[98] Day 1 AM Tr. N.T. 60:8-11 (Kuri direct).

[99] Day 1 AM Tr. N.T. 77:11-14, 95:15–96:9 (Kuri cross).

[100] Day 2 Tr. N.T. 215:4-6 (Bannan direct).

[101] Day 2 Tr. N.T. 119:19-22 (Garcia cross).

Despite counsel's attempt to impeach Ms. Bannan's belief that she could recognize the voice as Mr. Odessa's, it is not her belief about the caller that is important, but rather Mr. Narewski's response to her assessment.

[102] Day 2 Tr. N.T. 215:2-16 (Bannan direct).

[103] Day 1 PM Tr. N.T. 69:1–70:17, 74:19-24 (Odessa cross).

dispute, AlfaModess was Catalent's house broker;[104] (2) on the eve of trial, Mr. Odessa was able

to produce documents he believed were helpful to his case;[105] and (3) Mr. Odessa was far from a

novice when it came to computers.[106] For instance, although AlfaModess produced credit

applications made to it by Catalent from 2007 and 2008,[107] it was unable to produce one from

2006.[108] This production and nonproduction, of course, is consistent with the dock schedulers'

account that Mr. Narewski instructed them to begin using AlfaModess in 2007.

It seems inescapable that Mr. Odessa, and through him, AlfaModess, have attempted to

sell the Court a bill of goods. Instead, the evidence, though circumstantial, clearly compels the

conclusion that at some point early on in their relationship, Mr. Odessa and Mr. Narewski

devised a plan to reroute East Coast's invoices, for work that East Coast performed as Catalent's

house broker, to AlfaModess for markup and resubmission to Catalent as if AlfaModess had

performed the brokerage services. There is no other way to explain the dock schedulers' many

calls to East Coast, their testimony that they had been told by Mr. Narewski to use East Coast as

the house broker, and the 413 invoices sent by East Coast directly to Catalent. Mr. Odessa's

account is entirely implausible and cannot be credited. His contentions are flatly contradicted by

other testimony and evidence of record. Their testimony, by contrast, is consistent with the

evidence of record (such as, for example, the credit applications, "carrier" name in the bills of

lading, Ms. Wigmore's story and the fax to her from Mr. Snyder, etc.). Again, all the dock

schedulers testified that, at Mr. Narewski's direction, they called East Coast to arrange for freight

---

[104] *E.g.*, P-37; P-38; P-41; P-42; P-44; P-47; P-48; P-49 (various emails from Catalent email addresses to AlfaModess email addresses regarding orders for freight transportation).

[105] *See* Day 3 Tr. N.T. 129:22–139:17 (argument by counsel).

[106] *E.g.*, Day 1 PM Tr. N.T. 37:25–38:25 (Odessa cross).

[107] P-1.

[108] Day 1 PM Tr. N.T. 82:3-10 (Odessa cross).

transportation—and Mr. Ligato said they made such calls at least 10 or 20 times per week.[109] The dock schedulers would prepare a bill of lading and write "East Coast" in the upper right hand corner under the space for carrier.[110] Then, as the parties *stipulated*, East Coast "sent invoices directly to [Catalent's Red Lion Road facility] 413 times from January of 2006 to August 14, 2006."[111] Mr. Odessa's response? That East Coast "initially by, let's name it, mistake, . . . sent *a few* invoices to Catalent," and after he "was informed from Catalent about this" he fixed the mistake and began "to receive invoices" at AlfaModess's P.O. Box in Hatboro, Pennsylvania.[112] And while it is true that AlfaModess *was paid* by Catalent for the amounts invoiced by East Coast—in fact, Catalent paid AlfaModess for East Coast's services with, on average, a 90.06% markup[113]—Philip Kuri, who testified that he worked for AlfaModess from February 2007 through November 2008 (at the time, AlfaModess was only Mr. Odessa and Mr. Kuri[114]),[115] acknowledged that there was no "evidence whatsoever, paper, document, e-mail, otherwise, that [he] saw while [he was] in that office which would suggest that East Coast was doing anything for AlfaModess before [he] got there."[116] The *only* reasonable inference is that Mr. Narewski rerouted East Coast's invoices to AlfaModess so that AlfaModess, having done nothing, could generate its own invoices and send them back to Catalent for payment, as if AlfaModess had done the brokering. And, indeed, under Catalent's standard operating procedure

---

[109] *See supra* notes 21 through 28 and accompanying text.

[110] *See supra* notes 29 and 30 and accompanying text.

[111] Stipulations ¶ 1.

[112] Day 1 PM Tr. N.T. 78:25–79:19  (Odessa cross) (emphasis added).

[113] Stipulations ¶¶ 3-4.

[114] Day 1 AM Tr. N.T. 46:22–47:1 (Kuri direct).

[115] Day 1 AM Tr. N.T. 45:21–46:1 (Kuri direct), 108:25–109:1 (Kuri cross).

[116] Day 1 PM Tr. N.T. 111:4-8 (Kuri cross).

at the time, according to Jeffrey Kimmler, at the time a controller (accountant) for Catalent, incoming invoices for transportation services would be redirected to Mr. Narewski for Mr. Narewski's approval.[117] Mr. Narewski, in turn, approved payment to AlfaModess for work done by East Coast.[118]

This evidence alone would be enough. But the circumstances are further suspect, even beyond Mr. Odessa's apparent attempt to downplay his relationship with Mr. Narewski and Mr. Narewski's apparent decision not to testify. For example, AlfaModess showed an inability to obtain clients other than Catalant. As Mr. Kuri testified, Catalent was AlfaModess's only customer while Mr. Kuri worked for AlfaModess—despite Mr. Kuri's efforts to find other business,[119] AlfaModess did not even receive orders from any other customers.[120] Notwithstanding Mr. Kuri's testimony, however, Mr. Odessa attempted to explain that AlfaModess had other business before Mr. Kuri began. When asked about his work as a freight broker between 2004 and 2006, Mr. Odessa stated that he worked with "multiple truckers," but he could not name one shipper other than Catalent for which he moved freight. Instead, he described trucking companies, "John's Trucking, some like Smith Trucking" or "Bob's Trucking [or] something like that," and asserted that "[i]t was dozens of companies which have last name of owner and connected to word trucking" for which he arranged shipments.[121] But when pressed to name a shipper, Mr. Odessa explained that he "did not move loads without broker license," but rather that he "found loads over Internet and inform about those loads to the drivers, to the

---

[117] Day 2 Tr. N.T. 173:12-16 (Kimmler direct).

[118] Day 2 Tr. N.T. 173:12–175:1 (Kimmler direct); D-47; *see also, e.g.*, D-44 at 4; D-45 at 4.

[119] Day 1 AM Tr. N.T. 81:14–83:24 (Kuri cross).

[120] Day 1 AM Tr. N.T. 81:11-12; 81:21–82:1 (Kuri cross).

[121] Day 1 PM Tr. N.T. 50:8–51:3 (Odessa cross).

small trucking companies and held commissions for that."[122] When pressed a third time to "name

one shipper that you serviced . . . from 2004" to "January of 2006, one, just one name," Mr.

Odessa replied, "It was multiple companies," but that he did "not recall exactly names," and that

he did not "recall right now specific names because it was many—let's say not just a few dozens.

It was even maybe hundreds of different companies, which I found . . . over Internet."[123] There is

no record evidence to support any of these assertions.


### Accounting for Fraud

All in all, from January 2006 through May 2008, Catalent paid AlfaModess

$1,763,516.[124] The parties further stipulated that $835,872 of this sum was the amount Catalent

paid AlfaModess above the price invoiced by the underlying broker or carrier.[125] Of this latter

figure, $794,018 is the result of markups on East Coast's invoices and the remaining $41,854

resulted from markups on C.H. Robinson's invoices.[126] Catalent does not owe East Coast for the

services East Coast performed on Catalent's behalf.[127] The parties further stipulated that

"AlfaModess's average markup over and above C.H. Robinson's invoices for services rendered

was 148.63%."[128] Thus, the $41,854 markup is based on billings from C.H. Robinson in the

amount of approximately $28,160 (via $41,854/1.4863). Based on the testimony of Catalent

expert Brad Milone and common sense, the Court finds that 5% is the highest average industry

---

[122] Day 1 PM Tr. N.T. 51:7-13 (Odessa cross).

[123] Day 1 PM Tr. N.T. 52:6-17 (Odessa cross).

[124] Stipulations ¶ 7.

[125] Stipulations ¶ 8.

[126] Day 3 Tr. N.T. 110:24–111:17 (Midkiff direct).

[127] Day 3 Tr. N.T. 45:5-11 (Wigmore cross).

[128] Stipulations ¶¶ 5-6.

markup for cobrokering (a 148% markup is "absolutely unheard of" because the industry competes to "offer a more efficient rate");[129] thus, $1408 (via $28,160 • 0.05) is the brokerage commission to which a reasonable cobroker would have been entitled.

### Warning: Steep (Prices) Grade; Check Brakes—But Catalent Keeps on Trucking

On March 30, 2007, a lawyer for East Coast sent Catalent's legal department a letter seeking reinstatement of East Coast as Catalent's house broker.[130] Gary Krauss, who was Catalent's human resources director at the time and participated to some extent in the investigation,[131] testified at trial that the letter "rais[ed] some concerns that Steve Narewski, who was our logistics supervisor, had basically pushed [East Coast] out of the business of transporting product, trucks in and out of our company, and he brought in a company called AlfaModess."[132] He thought that the allegations in the letter "may have been more general to Catalent" as opposed to specifically against Mr. Narewski and AlfaModess, although he recognized that "Steve may have been named in particular."[133]

In fact, the letter stated, in pertinent part:

> The undersigned represents East Coast Transport & Logistics, LLC ("ECTL"), which is a broker in interstate and foreign commerce licensed by the Federal Motor Carrier Safety Administration ("FMCSA"). Cardinal Health, Inc. ("Cardinal") [Catalent] did business with ECTL in the state of New Jersey through its Traffic Manager, Steven Narowski ("Narowski") [sic], by contracting with ECTL for the transportation of its freight at your Philadelphia, Pennsylvania facility with motor carriers secured by ECTL. ECTl [sic] has a $110,000.00 bond,

---

[129] Day 3 Tr. N.T. 73:1-11, 76:24-25 (Milone direct).

[130] P-14.

[131] Day 2, 125:2-17 (Krauss direct).

[132] Day 2, 127:20–128:1 (Krauss direct).

[133] Day 2, 128:2-8 (Krauss direct).

along with cargo insurance of $500,000.00 and liability insurance of $5,000,000.00. As you may know, FMCSA only requires a bond for brokers.

ECTL engaged the services of Burlington Motor Xpress, Inc. of Burlington, New Jersey ("BMX"), among other motor carriers, to transport the freight of Cardinal [Catalent].

AlfaModess Logistics, LLC ("AlfaModess"), through its Logistics Manager, Philip Kuri ("Kuri"), audited ECTL freight bills of ECTL to Cardinal [Catalent]. AlfaModess also possess broker authority from FMCSA in Docket No. MC544782. This latter fact was not known to ECTL when it submitted its bills to Cardinal [Catalent], nor did Mr. Narowski advise ECTL of same.

Based upon information and belief, Narowski provided AlfaModess and Kuri with the identity of ECTL truckers, including BMX, used by ECTL for the movement of Cardinal freight so that AlfaModess and Kuri could contact ECTL truckers to divert their services to AlfaModess.

Without the above conduct of AlfaModess, Kuri and Narowski, AlfaModess would not have knowledge of, or access to, the confidential information and trade secrets of ECTL, including the identity of ECTL's truckers utilized in the transportation services provided by ECTL to Cardinal [Catalent], ECTL's rate setting procedures and rate schedules, as well as its rate schedules and formulae with respect to the truckers utilized in the provision of transportation services of ECTL for Cardinal [Catalent].

As a direct and proximate result of the above-described acts of AlfaModess, Narowski and Kuri, ECTL has been deprived of all the benefits from Cardinal [Catalent] that it should derive from the development of its confidential information, for which ECTL has expended large sums of money, time and effort. AlfaModess, Kuri and Narowski willfully, knowingly and intentionally procured, disclosed and utilized the confidential and trade secret information and other property known to belong to ECTL without ECTL's consent, knowledge, authorization or agreement.

Daniel J. Latta, president of ECTL, invited Mr. Narowski to lunch on March 27, 2007 in an attempt to amicably resolve the problem. Mr. Narowski acknowledged that ECTL had performed well for its 15 months of service for Cardinal, that ECTL rates were "great" and there were no problems with the service. When asked how AlfaModess could have contacted BMX and other ECTL truckers to take the business away from ECTL and why Cardinal [Catalent] would use AlfaModess which has no D & B record, no street address, no telephone number listed and only an email address, Mr. Narowski had no response. When confronted with the possibility that Mr. Narowski provided AlfaModess with the names of ECTL truckers serving Cardinal, Mr. Narowski stated "this meeting is over[,"] and left the restaurant without eating his meal.

Therefore, ECTL demands that Cardinal [Catalent] enjoin Narowski from hiring or otherwise retaining AlfaModess and Kuri in any capacity for Cardinal [Catalent], and restore ECTL's operations for Cardinal. Pursuant to my client's

instruction, if a satisfactory resolution is not obtained, it intends to file civil
litigation in New Jersey against AlfaModess Logistics, LLC, Philip Kuri and
Steven Narowski for compensatory and punitive damages, and damages under
New Jersey's RICO Act.[134]

After it received East Coast's March 30, 2007 letter, Catalent launched an investigation

headed by two attorneys, Jason Maxwell and Mikeisha Anderson.[135] As Mr. Krauss explained,

what followed from March through early fall of 2007 were "some letters back and forth between

East Coast['s] and Catalent's attorneys," with "threats of maybe lawsuits or some further

litigation.[136] Mr. Krauss's role in the investigation was somewhat peripheral (he was "not part of

the fact finding mission"),[137] but he "did get requests at times to help . . . define the

org[anizational] structure back there or who is Kathy Bannan or who is Mark Ligato, things of

that nature."[138]

Mr. Krauss also explained that the investigating team performed "a review of some of

[Mr. Narewski's] personal [personnel?] files regarding his abrupt and insensitive interactions

with some of his staff," and that they "were considering termination."[139] In particular, Mr.

Narewski received a "final warning" on July 5, 2007, because of "a response or a couple of

responses that he made specifically to Mikeisha Anderson and Jason Maxwell" as the two

attorneys "were trying to investigate the claims of East Coast."[140] During the investigation, the

attorneys "were looking for cooperation from several people . . . including Steve [Narewski] and

the team that worked for Steve," but in "a couple of responses Steve was, in our view, very

---

[134] P-14, at 1-2.

[135] P-14, at 1-2.

[136] Day 2 Tr. N.T. 130:1-16 (Krauss direct).

[137] Day 2 Tr. N.T. 129:24–125:3, 132:1-5 (Krauss direct).

[138] Day 2 Tr. N.T. 131:21-24 (Krauss direct).

[139] Day 2 Tr. N.T. 134:13-18 (Krauss direct).

[140] Day 2 Tr. N.T. 136:11-16 (Krauss direct).

disrespectful, very uncooperative, very defensive," such that the team was "a bit surprised by that initially. And then I think suspicions started to grow, why is he being so defensive and uncooperative[?]"[141] After all, "[y]ou have an obligation as an employee of [Catalent] to cooperate with the investigation that is taking place."[142] Mr. Krauss, Andy Polywacz, the General Manager, and Renard Jackson, the Vice President of Business Development, began to wonder why Mr. Narewski would "respond to the two attorneys that were trying to do this investigation with such almost defensiveness, anger," with "I provided these documents before," and "[h]ow dare you ask me for them again, kind of responses."[143] When Ms. Anderson asked Mr. Narewski "a bunch of questions," Mr. Narewski responded that he had already answered the questions; in turn, Mr. Maxwell responded to Mr. Narewski that he was "more than a little puzzled at . . . your less than cooperative if not defensive response to Ms. Anderson's email" because "no one within the company is saying you did anything wrong."[144] Based on such exchanges, Messrs. Krauss, Polywacz, and Jackson "started to wonder what [was] going on back there and [whether] maybe there [was] some truth to East Coast's concerns."[145]

According to Mr. Krauss, Catalent's attorneys considered East Coast's letter as a communication from "a disgruntled transportation company [that] wanted our business" and sent the March 30, 2007 letter to try to get it back.[146] And while "there was speculation" of fraudulent billing, "which is why there was an investigation," Mr. Krauss was unaware, at the time, of any

---

[141] Day 2 Tr. N.T. 136:16-25 (Krauss direct).

[142] Day 2 Tr. N.T. 136:25–137:3 (Krauss direct).

[143] Day 2 Tr. N.T. 130:13-14, 133:16-18, 138:13-22 (Krauss direct).

[144] Day 2 143:11–144:10 (Krauss cross (quotation from Mr. Cohen's question)).

[145] Day 2 Tr. N.T. 138:24–139:1 (Krauss direct).

[146] Day 2 Tr. N.T. 141:3-14 (Krauss cross).

fraudulent billing.[147] In Mr. Krauss's understanding, East Coast was "accusing AlfaModess and Narewski of somehow getting those trucking names and then calling the trucks directly and cutting out East Coast," but East Coast was not alleging fraudulent billing.[148] In Mr. Krauss's understanding, Mr. Narewski "was not the subject of the investigation"; rather, Catalent's attorneys "needed his information"—which, as described above, he was uncooperative in providing—"to deal with the ECTL issue."[149] Still, when Mr. Narewski wrote that there was no contracting activity between Catalent and East Coast, and, rather, that AlfaModess was Catalent's broker, Mr. Krauss felt that he had no reason to doubt Mr. Narewski's representations because, in part, "[e]ach business unit has a general manager and usually an HR person reporting up through them to handle things like this," and Catalent would rely upon the representations made by supervisors of those units.[150] Catalent also apparently had access to at least some East Coast bills of lading and/or invoices.[151]

On August 28, 2007, Mr. Maxwell wrote to East Coast's attorney that upon Mr. Maxwell's investigation, he had

> learned that, although the invoices [East Coast] provided from ECTL are directed to [Catalent], Alfa Modess [sic], rather than [Catalent,] paid them. I further learned that ECTL sent these invoices to [Catlent], despite [Catalent's] employees['] repeated instructions to send them to Alfa Modess instead. I have also been unable to locate any evidence that [Catalent] ever paid ECTL (directly) for any service. In summary, the results of my further investigation are all consistent and support the conclusion that Alfa Modess always served as

---

[147] Day 2 Tr. N.T. 142:7-10 (Krauss cross).

[148] Day 2 Tr. N.T. 142:11-24 (Krauss cross (quotation from Mr. Cohen's question)).

[149] Day 2 Tr. N.T. 144:6-10 (Krauss cross (quotation from Mr. Cohen's question)).

[150] Day 2 Tr. N.T. 146:15–148:16, 153:17-23 (Krauss cross).

[151] Day 2 Tr. N.T. 139:13-18 (Krauss direct), 160:12-15 (Krauss redirect).

> [Catalent's] logistics manager with regard to your client, and that [Catalent] did
> not have a direct relationship with ECTL.[152]

And so the matter was put to rest, for the time being.

*   *   *

Meanwhile, in or around June 2007, East Coast sued AlfaModess, Mr. Odessa, and Mr. Narewski.[153] Mr. Odessa initially paid Mr. Narewski's legal fees when the two were sued (along with AlfaModess) by East Coast.[154] Although Mr. Odessa testified that he was not paying Mr. Narewski's legal fees so much as paying the combined defense bill—the lawyers, he averred, did "not ask [for] any additional payments for Narewski separately. They just [took the] case altogether"[155]— Mr. Odessa's account is implausible and irrational. Mr. Odessa had no response to counsel's question as to why Mr. Narewski "shouldn't . . . have to chip in for some of the legal fees" other than the questionable assertion that the lawyer Mr. Odessa approached on the advice of his sister just "happen[ed] to be the same lawyer [who] was recommended for Steve Narewski by his professor at college. And it's [sic] came up just by coincidence he contact them on his own."[156] Mr. Odessa could "recall" no further "specifics," including which of the two men set up the appointment with the lawyer after they allegedly realized they had been referred to the same one,[157] and he was evasive when asked repeatedly whether he was "paying for the lawyers for [himself] and Mr. Narewski."[158] Mr. Odessa's ultimate answer, however, suggests some

---

[152] Day 2 Tr. N.T. 146:15–148:16, 153:17-23 (Krauss cross).

[153] Day 1 PM Tr. N.T. 57:6-23 (Odessa cross).

[154] Day 1 PM Tr. N.T. 57:12-23 (Odessa cross).

[155] Day 1 PM Tr. N.T. 57:24–58:4 (Odessa cross).

[156] Day 1 PM Tr. N.T. 58:12–59:6 (Odessa cross).

[157] Day 1 PM Tr. N.T. 59:12-23 (Odessa cross).

[158] Day 1 PM Tr. N.T. 60:25–61:20 (Odessa cross).

29

friendship or cooperation between the two—"initially I paid for a certain amount of legal fees as a business," and only later the two "start[ed] to share expenses"[159]—because why, after all, would AlfaModess, *as a business*, be concerned about Mr. Narewski if he was not affiliated with it?

### Relations Break Down

As explained earlier, in March 2007, Mr. Narewski instructed the three dock schedulers to use AlfaModess rather than East Coast as the house broker.[160] True to his direction, between March 2007 and April 2008, the dock schedulers contacted AlfaModess to arrange for freight transportation.[161] Mr. Narewski never revealed his relationship (or tenancy) with Mr. Odessa to the dock schedulers or anyone at Catalent.[162] When Mr. Kuri, AlfaModess's only employee (other than Mr. Odessa), received a request for transportation, in most cases he did little more than pass the request on to C.H. Robinson, "the Wal-Mart," i.e., "largest provider of brokerage"[163]—Mr. Kuri testified that he used C.H. Robinson hundreds of times and was unable to name any carrier other than Gray's Trucking.[164] (In fact, Mr. Kuri relied on Mr. Odessa's statement that C.H. Robinson's rate was a competitive rate in the industry; he did not call other brokers to compare rates when he was using C.H. Robinson.)[165] AlfaModess then marked up the

---

[159] Day 1 PM Tr. N.T. 61:14-20 (Odessa cross).

[160] *See supra* note 89 and accompanying text.

[161] *E.g.*, Day 2 Tr. N.T. 49:7-12 (Ligato direct), 107:23–108:4, 109:7-16, 115:7-25 (Garcia direct), 207:5-11 (Bannan direct).

[162] Day 2 Tr. N.T. 213:23–215:16 (Bannan direct).

[163] Day 3 Tr. N.T. 64:15-17 (Milone direct).

[164] Day 1 AM Tr. N.T. 77:15-19, 78:1-7 (Kuri cross).

[165] Day 1 PM Tr. N.T. 108:1-24 (Kuri cross).

invoices to be submitted to Catalent—in the case of C.H. Robinson invoices, by a stipulated 148.63%.[166]

In March and April 2008, Catalent began refusing to pay some of AlfaModess's invoices for outbound transportation because they were marked "collect" and, Catalent contended, should be paid by the receiver of the freight rather than by Catalent as the shipper.[167] By April 2008, AlfaModess was no longer performing brokerage services for Catalent.[168] On April 22, 2008, Mr. LA Torre sent Mr. Kuri a letter making clear Catalent's refusal to accept collect invoices in the future and noting that although Catalent had "consistently paid these [collect] invoices in the past," it had "gone back to [its] customer[s] for reimbursement."[169] Mr. LaTorre's letter stated, in pertinent part:

> Effective immediately, we will no longer accept these [collect] invoices. We expect AlfaModess to invoice the appropriate customer as listed on the BOL [bill of lading]. We will assist AlfaModess in collecting the said transportation fees when appropriate. This assistance will include communicating any issues to our procurement contacts within each of our customers. Any delinquent payments that cannot be resolved through this effort will be AlfaModess [sic] responsibility and a matter between Alfa Modess [sic] and the customer, only. Catalent Pharma Solutions will not assume any liability for these payments.[170]

In many cases, after further evaluation of the invoices, Catalent determined that AlfaModess was billing Catalent at an inflated rate for services provided many months earlier, as

---

[166] Stipulations ¶ 5.

[167] *See* P-7; P-8; Catalent's Proposed Findings and Conclusions ¶ 92, at 17; AlfaModess's Proposed Findings and Conclusions ¶ 35, at 7.

[168] Day 1 PM Tr. N.T. 98:8-13 (Odessa cross).

[169] P-8.

[170] P-8.

Mr. LaTorre would later communicate to Mr. Kuri on October 31, 2008.[171] Hence, Catalent refused to pay a number of AlfaModess's invoices.

AlfaModess claims that, for the time period of March 2007 to April 2008, Catalent owes AlfaModess $963,010 in unpaid invoices, plus delinquency processing fees in the amount of $85,600.[172] Based on AlfaModess's heavy use of C.H. Robinson and the stipulated 148.63% markup for C.H. Robinson invoices, the claimed $963,010 translates to approximate aggregate charges from C.H. Robinson of $387,327 (via $963,010/2.4863) and, thus, an approximate markup of $575,683 (the difference).[173] In comparison, a reasonable 5% markup on the $387,327 would be $19,366.

At trial, AlfaModess adduced no competent evidence that AlfaModess actually paid C.H. Robinson (or other brokers and carriers) for the work the latter did on Catalent's behalf. The only "evidence" AlfaModess produced was a spreadsheet constructed by Mr. Odessa of wire and check payments he alleges he made to brokers and carriers from the 2007 to 2008 time period.[174] When asked on cross-examination whether he could "identify which transportation moves" a given payment was for, Mr. Odessa conceded that he could not.[175] He further admitted that he did not know where certain wire transfers went.[176] Mr. Odessa contends that he created the spreadsheet from his bank statements, but he did not produce them in the litigation (he had them "only in [his] possession").[177] Moreover, 301 C.H. Robinson invoices demonstrate that no

---

[171] P-9.

[172] P-3; AlfaModess's Proposed Findings and Conclusions ¶¶ 60-61, at 11.

[173] *Accord* Day 3 Tr. N.T. 109:12–110:13 (Midkiff direct).

[174] The spreadsheet is P-4.

[175] Day 2 Tr. N.T. 4:24–5:9 (Odessa cross).

[176] Day 2 Tr. N.T. 6:13-15 (Odessa cross).

[177] Day 2 Tr. N.T. 5:21–6:9 (Odessa cross).

payment had been received or that there was a balance due.[178] And, further complicating factors, it is entirely impossible to establish which payments AlfaModess allegedly made for invoices for outbound transportation with bills of lading marked "collect," a word that, in the industry, means that the recipient of the freight, rather than the shipper, is to pay, as even Mr. Kuri acknowledged.[179] Finally, having observed him as a witness, the Court concludes that Mr. Odessa is not credible and, moreover, the Court will not credit Mr. Odessa's self-serving spreadsheet in any event.

In conjunction with notifying AlfaModess that Catalent would not pay certain invoices, in April 2008, Mr. LaTorre instructed Mr. Narewski to stop using AlfaModess as the house broker and to begin using Rockwell Transportation. Instead of following the directive, Mr. Narewski confused the dock schedulers by countermanding his superior's order.[180] In an April 10, 2008 fax from Mr. Narewski sent all around Catalent,[181] Mr. Narewski claimed, perhaps ironically, that Mr. LaTorre was receiving kickbacks from Rockwell and that Mr. LaTorre stated as much to the shipping staff,[182] although the dock schedulers deny ever having heard such a statement from Mr. LaTorre.[183] At this time witnesses observed Mr. Narewski shred documents

---

[178] *See* D-48.

[179] Day 1 AM Tr. N.T. 62:5-8 (Kuri direct), 101:13-16 (Kuri cross).

[180] *E.g.*, Day 2 Tr. N.T. 58:7–59:4 (Ligato direct), 89:10–91:20 (Ligato cross), 116:6-2 (Garcia cross), 149:12–150:6 (Krauss cross), 216:25–218:10 (Bannan direct).

[181] D-23; *see* Day 2 Tr. N.T. 92:14–93:3 (Ligato cross).

[182] *See, e.g.*, D-23; Day 2 Tr. N.T. 92:14–93:15 (Ligato cross).

[183] Day 2 Tr. N.T. 93:6–94:12 (Ligato cross).

more vigorously than usual.[184] Soon afterwards, on April 15, 2008, Mr. Narewski was fired for insubordination and his earlier disrespectful attitude toward the investigating lawyers.[185]

Then, in June 2008, Mr. Narewski started showing up at AlfaModess's offices about twice a week, according to Mr. Kuri.[186] Mr. Narewski would simply say hello to Mr. Kuri and then go into Mr. Odessa's office, where the two would talk, although Mr. Kuri did not know what they discussed.[187] Mr. Kuri believed that Mr. Narewski would stay for a couple of hours each time.[188] These visits continued through at least October 2008, and sometimes all three men, Messrs. Odessa, Narewski, and Kuri, would go out to dinner together.[189] In November 2008, Mr. Odessa laid Mr. Kuri off "[b]ecause there was no work and no finances to keep going."[190] Still, despite having been laid off, Mr. Kuri continued to help Mr. Odessa with various tasks, such as formatting and sending, under Mr. Kuri's name, emails to Mr. LaTorre at Catalent.[191]

---

[184] *See supra* notes 83 & 91 and accompanying text.

[185] D-24 (official termination letter from Catalent to Mr. Narewski); *see also, e.g.*, Day 2 Tr. N.T. 149:10–150:6 (Krauss cross).

[186] Day 1 AM Tr. N.T. 88:9–89:12, 89:24 (Kuri cross).

[187] Day 1 AM Tr. N.T. 89:4-12 (Kuri cross).

[188] Day 1 AM Tr. N.T. 90:2-4 (Kuri cross).

[189] Day 1 AM Tr. N.T. 90:13-15 (Kuri cross).

[190] Day 1 AM Tr. N.T. 70:15–19 (Kuri direct); 91:1-3 (Kuri cross).

[191] Day 1 AM Tr. N.T. 86:3–91:11, 105:8–107:1 (Kuri cross).

**Some Said They Said We Said**

In February 2009, Catalent learned from some customers that AlfaModess was sending them letters attempting to obtain payment for the collect invoices.[192] The AlfaModess letters stated, in pertinent part:

> Management at Catalent in Philadelphia has refused to pay freight invoices and has directed AlfaModess to collect freight charges from Catalent's customers.
>
> Catalent stated that their customers have agree to this and expect to be charged for the transportation expenses.
>
> According to Catalent, you are responsible for these freight charges and you have agreed to pay the amount due for transportation. . . .
>
> These included invoices have already been issued to Catalent and are now past due.
>
> The past due invoices, will quickly become delinquent and in default.
>
> Failure to pay promptly will incur late fees, collection costs and all reasonable measures to collect the owed amount.
>
> AlfaModess demands that payment is made immediately.[193]

Catalent responded by sending its own letter to customers:

> Despite the information contained in the letters being sent by AlfaModess, Catalent has never agreed that the charges sought by AlfaModess from Catalent's customers are accurate, timely, or payable at this time from any party, including Catalent's customers. In fact, there is a strong basis to challenge these charges since they have not been presented for payment for months and in many cases for well over a year. AlfaModess has not supplied any basis for its failure to supply freight billing it believes is due in a timely manner. . . .
>
> We sincerely apologize for any inconvenience or confusion caused by the AlfaModess demands and thought that it was important to notify you of Catalent's position relative to the content of those communications should you have been the recipient of such communications. The determination should be made between you and AlfaModess and you might independently determine that such charges are properly payable to AlfaModess.[194]

---

[192] *See* P-55 (January 28, 2009 letter from Mr. Kuri to Advancis Pharmaceutical Corp.); Day 1 AM Tr. N.T. 68:12–69:6 (Kuri direct).

[193] P-55.

[194] P-52 (April 13, 2009 letter from Kirk LaTorre at Catalent to Ms. Lee at Teva Pharmaceuticals).

Mr. Kuri's understanding from this correspondence was that "the determination for payment [would] be between AlfaModess and the customer."[195] In Mr. Kuri's understanding, Mr. LaTorre, in the April 22, 2008 letter, "did not promise" to make Catalent's customers pay AlfaModess for collect charges; rather, "he just sent [AlfaModess] to their [Catalent's] clients to collect."[196] After Catalent told AlfaModess that AlfaModess should seek payment for invoices marked "collect" from the clients directly, "[s]ome customers actually paid AlfaModess, [and] some [did] not," according to Mr. Odessa.[197]

## CONCLUSIONS OF LAW

### The Parties' Contentions

AlfaModess claims that Catalent breached an implied contract, which was created when Catalent contacted AlfaModess to arrange freight transport[198] and which "is also evidenced by the parties' several-year history of doing business together."[199] It claims contract damages in the sum of $964,010 in unpaid invoices and $85,600 in collection costs.[200] In the alternative, AlfaModess contends that it has proven Catalent's unjust enrichment because "it would be unconscionable for Catalent to retain the benefits of AlfaModess's services without

---

[195] Day 1 AM Tr. N.T. 103:22–104:3 (Kuri cross (quotation from Mr. Cohen's question)).

[196] Day 1 AM Tr. N.T. 104:4-15 (Kuri cross).

[197] Day 1 PM Tr. N.T. 31:22-23 (Odessa direct).

[198] AlfaModess's Proposed Findings and Conclusions ¶ 3, at 12.

[199] AlfaModess's Proposed Findings and Conclusions ¶ 4, at 13.

[200] AlfaModess's Proposed Findings and Conclusions ¶ 7, at 14. AlfaModess has abandoned its claim of breach of an express contract. *See generally* AlfaModess Proposed Conclusions of Law; *see also generally* June 9, 2014 Closing Arguments Tr. 8:6-15 (The Court: "Your claim is either there's an implied contract or there's been unjust enrichment. . . . [H]ow do you create a contract out of these facts?" Mr. Benecke: "The implied contract, Your Honor, can be found by looking to the actions of the parties.").

compensating AlfaModess for work performed at Catalent's behest."[201] AlfaModess also claims

that Catalent committed fraud "when it assured AlfaModess that it would assist AlfaModess in

collecting payments (on AlfaModess's invoices) from Catalent's customers, even though

Catalent advised such customers" that such payments may not, in fact, be due.[202]

      In addition to denying AlfaModess's allegations, Catalent claims that Messrs. Odessa and

Narewski conspired to defraud Catalent by claiming that AlfaModess, rather than East Coast,

was Catalent's house broker, and generating the invoices to match. Based on the same facts,

Catalent also charges AlfaModess, Mr. Odessa, and Mr. Narewski with civil conspiracy,[203] Mr.

Narewski with aiding and abetting,[204] and AlfaModess and Mr. Odessa with conversion.[205] In the

alternative, Catalent claims unjust enrichment on the part of AlfaModess for the sums previously

paid to it.[206]


## The Court's Conclusions of Law

### *The Counterclaim and Third Party Defendants Committed Fraud by Claiming Credit for East Coast's Work*

      From February 2006 through March 2007, AlfaModess committed fraud by claiming to

have performed the work for Catalent that East Coast, in fact, was doing. AlfaModess argues,

---

[201] AlfaModess's Proposed Findings and Conclusions ¶¶ 9–11, at 14-15.

[202] AlfaModess's Proposed Findings and Conclusions ¶¶ 12–19, at 15-17.

[203] Catalent's Proposed Findings and Conclusions ¶¶ 182–91, at 59-61.

[204] Catalent's Proposed Findings and Conclusions ¶¶ 192–200, at 61-63.

[205] Catalent's Proposed Findings and Conclusions ¶ 167 & n.6, at 57.

[206] Catalent's Proposed Findings and Conclusions ¶¶ 143–66, at 53-56.

however, that "Catalent cannot prevail on its claim of fraud because it fails to demonstrate all the requisite elements of same by clear and convincing evidence."[207] The Court disagrees.

> The elements of fraudulent misrepresentation are well settled. . . . [T]he party alleging fraud must prove, by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance.

*Porreco v. Porreco*, 811 A.2d 566, 570-71 (Pa. 2002) (citing *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999); Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)); *accord, e.g.*, *Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005).

Catalent has proven all of these elements, with clear and convincing evidence, with regard to Mr. Odessa, Mr. Narewski, and AlfaModess's fraudulent conduct in claiming that AlfaModess, and not East Coast, was Catalent's house broker from January 2006 through March 2007. AlfaModess sent Catalent hundreds and hundreds of invoices (1) representing that it had performed freight brokerage services for Catalent between January 2006 and March 2007. These representations (2) were obviously material: if accepted, they would induce a reasonable recipient to pay AlfaModess for such services rendered. But, as the Court has found, the representations (3) were false. The invoices do not "represent the work that AlfaModess performed at Catalent's behest," as the Counterclaim and Third Party Defendants argue.[208] Rather, the invoices misrepresent that AlfaModess performed brokerage services for Catalent. All that AlfaModess was actually doing, through Mr. Odessa and, surreptitiously, by Mr. Narewski, was rerouting East Coast's invoices to itself after East Coast, which Catalent's dock schedulers had called, had found the match between shipper and carrier. The Court has no doubt

---

[207] AlfaModess's Proposed Findings and Conclusions ¶ 8, at 20.

[208] AlfaModess's Proposed Findings and Conclusions ¶ 9, at 21.

that AlfaModess (4) intended to mislead Catalent, and, given Mr. Narewski's position as Catalent's logistics supervisor, there is also little question that the reliance (5) was justifiable or reasonable, notwithstanding the stipulated markups. The injury, (6) obviously proximate, is every cent that Catalent paid AlfaModess above what East Coast charged for the work East Coast performed for Catalent.

The Counterclaim and Third Party Defendants do not try very hard at all to rebut this version of events, but instead raise three issues. First, the Counterclaim and Third Party Defendants contend, Mr. Odessa and Mr. Narewski did not engage in any scheme to inflate the prices on the invoices sent to Catalent,[209] (because Mr. Odessa said so—Mr. Narewski did not testify). The Court finds Mr. Odessa wholly uncredible and also questions Mr. Narewski's silence Indeed, in the final analysis, that silence spoke volumes. After all, Catalent's evidence is circumstantial; if Mr. Narewski had a different version of events, he could have testified to provide direct evidence to rebut Catalent's theory. What is clear, however, and as addressed again below, is that there is no way to explain what happened from January 2006 through March 2007 other than to conclude that AlfaModess fraudulently billed Catalent for services performed wholly by others.

Second, the Counterclaim and Third Party Defendants contend that Catalent's fraud (and conversion, conspiracy, and aiding and abetting) claims are barred by Pennsylvania's two-year statute of limitations, *see* 42 Pa. Cons. Stat. Ann. § 5524.[210] The Court agrees, notwithstanding Catalent's discovery rule and fraudulent concealment arguments, which the Court takes up below, but analyzes the fraud nonetheless because it is the bedrock of Catalent's unjust enrichment claim.

---

[209] AlfaModess's Proposed Findings and Conclusions ¶ 8, at 19.

[210] AlfaModess's Proposed Findings and Conclusions ¶ 1, at 19.

And third, citing *Rohm & Haas Co. v. Continental Casualty Co.*, 781 A.2d 1172 (Pa. 2001), for the proposition that fraud must be proven by "clear and convincing" evidence, or by evidence "'so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts of the issue,'" *id.* at 1179 (quoting *Lessner v. Rubinson*, 592 A.2d 678, 681 (Pa. 1991)), the Defendants claim Catalent has not proven the elements of fraud by clear and convincing evidence.[211] But this argument is only the final cry in the Counterclaim and Third Party Defendants' persistent wailing that Catalent has leveled nothing more than insinuation and speculation against them. It falls on deaf ears, in the face of the evidence and application of common sense in this case.

What *Rohm & Haas* also explains is

that fraud "is never proclaimed from the housetops nor is it done otherwise than surreptitiously with every effort usually made to conceal the truth of what is being done. So fraud can rarely if ever be shown by direct proof. It must necessarily be largely inferred from the surrounding circumstances."

*Rohm & Haas*, 781 A.2d at 1179 (quoting *Shechter v. Shechter*, 76 A.2d 753, 755 (Pa. 1950)). The point, of course, is that at least some of the six elements of fraudulent representation will have to be proven by circumstantial evidence, for neither courts nor juries are mindreaders, and the very nature of fraud is to hide the truth.

Here, in fact, only two of the six elements must be proven by circumstantial evidence, while a third is a question of whether Catalent's reliance was reasonable. As noted, AlfaModess's invoices, indisputably material in that they represent that AlfaModess performed brokerage services for Catalent, also proximately caused Catalent's harm, notwithstanding the conclusory assertions of AlfaModess and Messrs. Odessa and Narewski,[212] because Catalent

---

[211] AlfaModess's Proposed Findings and Conclusions ¶¶ 8–12, at 20-21.

[212] *See* AlfaModess's Proposed Findings and Conclusions ¶ 12, at 21.

paid the invoices. And though the invoices were far more expensive than the industry average, by any estimation, the Court must conclude that, at the time of the payments at issue, Catalent reasonably relied on the man accepting AlfaModess's invoices on behalf of Catalent—Mr. Narewski.[213] (A fraudulent misrepresentation, of course, can be "*anything* calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991) (emphasis added).) Thus, the main questions the Defendants raise are whether Catalent has proven by clear and convincing evidence "that AlfaModess's invoices were false or fictitious," or that "Mr. Narewski knew that AlfaModess's invoices were false and fictitious,"[214] and whether Catalent has proven by clear and convincing evidence "that Mr. Odessa and Mr. Narewski intended for Catalent to rely on the fraudulent invoices because such invoices are not, in fact, fraudulent."[215] By its very phrasing, the second contention, whether the men intended Catalent to rely, is conceded if, in fact, the invoices are fraudulent. And so it must be: why would AlfaModess send an invoice, and Mr. Narewski approve it—as of course, he did, hundreds of times, by his signature—if not intending Catalent to rely?

So, really, only one question remains: Were the invoices false? Or, has Catalent shown, by clear and convincing evidence, that Mr. Narewski and Mr. Odessa schemed to reroute invoices from East Coast, for freight brokerage East Coast performed for Catalent, first to

---

[213] *See generally, e.g.*, *Porreco*, 811 A.2d at 571 ("While the nature of the relationship between the parties may affect the reasonableness of one's reliance, we hesitate to find reliance justified where the party claiming reliance had an adequate opportunity to verify the allegedly fraudulent statements." (footnote omitted)); *Markowicz v. SWEPI LP*, 940 F. Supp. 2d 222, 231-32 (M.D. Pa. 2013) (citing *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (2007)).

[214] *See* AlfaModess's Proposed Findings and Conclusions ¶¶ 9–10, at 21.

[215] *See* AlfaModess's Proposed Findings and Conclusions ¶ 11, at 21.

AlfaModess so that AlfaModess could generate invoices as if AlfaModess had done the freight brokerage work and then bill Catalent, which would, through Mr. Narewski's approval, then pay AlfaModess? By circumstantial evidence, Catalent has indeed shown as much. No other explanation fits the evidence and testimony of record. In short, as Debbie Wigmore, who worked in credit and collections for East Coast, testified, East Coast invoiced Catalent hundreds of times for freight brokerage services. The parties do not dispute—in fact, they stipulate—that over 400 times, East Coast sent these invoices directly to Catalent. On August 18, 2006, however, Jerry Snyder instructed Debbie Wigmore to stop sending the invoices to Catalent and begin sending them to AlfaModess. As Mr. Ligato and Ms. Bannan, two of Catalent's three dock schedulers, specifically testified, they had never heard of AlfaModess before Mr. Narewski instructed them to cease using East Coast and begin using AlfaModess. Every time they had to arrange a shipment, outbound or inbound—10 or 20 times a week, as Mr. Ligato testified, or at least 7 or 8 times per week, as Mr. Garcia testified—they had called East Coast and asked East Coast to broker the shipment.[216] In fact, all three dock schedulers testified that it was *Mr. Narewski* who had instructed them to use East Coast as the house broker from January 2006 through March 2007.

And then, in March 2007, *Mr. Narewski* instructed Catalent's dock schedulers to use AlfaModess, rather than East Coast, as the house broker. Catalent even produced an email from March 2007 in which Mr. Ligato wrote to two AlfaModess email addresses, "Hi this just a test to see if you get the e mail."[217] From this email, the inference is only reasonable that Catalent, outside of Mr. Narewski, was not communicating with AlfaModess until March 2007. The

---

[216] *See supra* notes 24-26 and accompanying text.

[217] D-72 (March 29, 2007 email from Mr. Ligato to "order@amlwebportal.com" and "pkuri@amlwebportal.com") ("Hi this just a test to see if you get the e mail . Thanks Mark Ligato"); Day 2 Tr. N.T. 86:1-24 (Ligato cross); *see also* note 90 and accompanying text.

evidence also shows, in the letter from East Coast's attorney to Catalent, that East Coast's president took Mr. Narewski to lunch to discuss the services East Coast was performing for Catalent; there is no indication that AlfaModess was then an intermediary (or intended to become an intermediary) between Catalent and East Coast. And still, although East Coast's invoices were paid—Ms. Wigmore testified that no amounts were outstanding—the record shows, by the parties' stipulation, that Catalent was paying AlfaModess for freight services performed between January 2006 and March 2007 (indeed, even AlfaModess and Messrs. Odessa and Narewski concede that East Coast was *involved*; they contend that East Coast was *their* cobroker ("subcontractor")).[218]

And several of the exhibits are quite damning to AlfaModess and Messrs. Odessa and Narewski's position, such as East Coast invoices originally sent to Catalent and matched up exactly, by East Coast invoice number and freight destination, with AlfaModess invoices. Why, again, would any noncolluding logistics supervisor permit his company (Catalent) to receive, *over 400 times*, invoices from a "cobroker" (i.e., East Coast, in the Counterclaim and Third Party Defendants' theory), to be sent back to their "broker," only so that the company would have to pay far more for those services? And, of course, the price was evident on each of East Coast's and AlfaModess's matching invoices. At *best*, such a logistics supervisor would be guilty of supine neglect, if not debilitating stupidity. Common sense, as well as industry practice, as Catalent's expert testified,[219] would prevent any reasonable shipper from routinely paying for "cobrokerage" services, whether or not such practices are *legal* (an issue on which AlfaModess and the Counterclaim and Third Party Defendants spin their wheels).

---

[218] *See* Stipulations ¶ 7.

[219] *See supra* notes 84–86 and accompanying text.

Of course, Mr. Narewski did not testify, so his mental faculties or intentions were not more directly probed. Nor is there much point in implicating him, as the statute of limitations has run, as discussed below, except for the purpose of making sense of his scheme with Mr. Odessa. But the evidence against him is just as damning. He was the one who, according to the dock schedulers, told them to use East Coast from January 2006 to March 2007 and then to use AlfaModess thereafter. He was the one who maintained to Catalent's investigators, from March 2007 onward, that Catalent never dealt with East Coast and that East Coast was simply one of AlfaModess's subcontractors, and he was the one who became surly with the investigators and refused to answer further questions. He was the one who was friendly with Mark Odessa and even rented half of Mr. Odessa's duplex, and his were the legal fees Mr. Odessa (or AlfaModess) paid when East Coast sued both men. He was the one who, after he was fired by Catalent, showed up at least weekly at AlfaModess's offices. And he was the one who attempted to reinstate AlfaModess as Catalent's house broker after his superior, Mr. LaTorre, explicitly directed him to use Rockwell because apparently Mr. LaTorre had finally recognized AlfaModess was charging rates well in excess of the industry average.[220] And he was the one who reacted ever so strangely when Ms. Bannan thought she recognized Mr. Odessa on the other end of the phone on a call supposedly with AlfaModess.

The Court recognizes that some Pennsylvania judicial decisions have historically described the "clear and convincing" standard for fraud as requiring not only

> that the witnesses must be found to be credible, [and] that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, [but also] that their testimony is so clear, direct, weighty, and

---

[220] *See* P-9 (October 31, 2008 letter from Kirk LaTorre at Catalent to Philip Kuri at AlfaModess) ("These charges are 20-40% more than the industry average for transportation in these lanes during this time period. Due to the long delay and amounts of these invoices we refuse to pay.").

> convincing as to enable the jury to come to a clear conviction, without hesitancy,
> of the truth of the precise facts in issue.

*Aliquippa Nat'l Bank ex rel. Woodlawn Trust Co. v. Harvey*, 16 A.2d 409, 414 (Pa. 1940)

(internal quotation marks and citations omitted). The Court also recognizes that, perhaps given

the five years this case has been pending, some witnesses have not testified "with specificity"

with regard to certain incidents. But, in fact, in spite of the passage of time, all three dock

schedulers testified that Mr. Narewski told them to use East Coast and then later told them to use

AlfaModess. They also testified that they called East Coast on numerous occasions, but had

never heard of AlfaModess. These recollections are not of the type that must be "distinctly

remembered and the details thereof narrated exactly"; rather, they are the types of working

knowledge that individuals possess as part of their normal duties. These claims are corroborated

by the numerous bills of lading from January 2006 through March 2007 on which dock

schedulers wrote in "East Coast," not AlfaModess, as the carrier, and the fact that remembering

not hearing of "AlfaModess" during that time period is not, in fact, something that *can* be

remembered with specificity. That is to say, the difficulty in proving a negative is well known; to

prove it "with specificity" would be harder, still—an unrealistic expectation, indeed. There are at

least two important negatives here that must be proven by the circumstantial evidence: that the

dock schedulers had not heard of AlfaModess and that AlfaModess did no work for East Coast.

Further, cases in which Pennsylvania courts have described the "clear, precise, and

indubitable" requirement demonstrate that the requirement is both general, as to the totality of

the evidence, as well as specific to the testimony regarding the alleged misrepresentations. In

*Aliquippa National Bank*, for instance, the Pennsylvania Supreme Court held that the plaintiff

had not met the standard because "[h]e did not show that he 'distinctly remembered the facts,'

nor did he 'narrate the details exactly,'" by contending only "in general terms that counsel for the

Trust Company told him 'dozens of times' that the records of the bank indicated he was still liable on his obligation," and also because, more importantly, the facts demonstrated that he did not "rely[] upon such alleged statements." *Id.* at 414-15.

Here, by contrast, the Counterclaim and Third Party Defendants' fraud was more in the nature of fraud in the factum than, as in *Aliquippa National Bank*, fraud in the inducement,[221] where the particular statements allegedly made by the defendants to induce the reliance must, of course, be recalled with specificity. *See, e.g.*, *Thomas v. Seaman*, 304 A.2d 134, 137 (1973) (dispute over what defendant said to plaintiff in inducing her to sell him the farm). *Cf. also generally supra* note 221. AlfaModess did nothing, but Catalent, through Mr. Narewski, paid it nonetheless. The fraud was not in the inducement; the fraud was Mr. Narewski's signing

---

[221] Fraud in the factum, or in the execution, is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents," *Langley v. FDCI*, 484 U.S. 86, 93 (1987); it is "a misrepresentation as to the character or essential terms of a proposed contract [that] induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract," such that "his conduct is not effective as a manifestation of assent," *Restatement (Second) of Contracts* § 163 (1981). Fraud in the factum renders a contract void ab initio, *see, e.g.*, *Restatement (Second) of Contracts* § 163 cmt. c; *Langley*, 484 U.S. at 93-94; *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 109-10 (3d Cir. 2000).

By contrast, fraud in the inducement, which occurs when "a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying," merely renders a contract voidable. *Restatement (Second) of Contracts* § 164; *accord, e.g.*, *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 178-79 (3d Cir. 1992); *Porreco*, 811 A.2d at 570-71 (Pa. 2002).

This case blurs that distinction. As the *Restatement (Second) of Contracts* notes, "[t]he mere fact that a party is deceived as to the identity of the other party, as when a buyer of goods obtains credit by impersonating a person of means, does not bring the case within the present Section, unless it affects the very nature of the contract." *Id.* § 164 cmt. a. Here, however, the actual contracts were between East Coast and Catalent. By fraud, Mr. Narewski and Mr. Odessa caused Catalent to pay documents based on false invoices purporting to be from the entity that performed the brokerage services. Catalent did not "contract" with AlfaModess; rather, it was deceived into paying AlfaModess for work AlfaModess did not do. Catalent manifested assent to paying for brokerage services supposedly performed by AlfaModess; it was getting, of course, nothing at all from AlfaModess.

invoices, for the company, which (other than the fraudulent-acting Mr. Narewski, of course) did not know of their true nature. There is no question to doubt that AlfaModess sent the invoices (they are in evidence) or that Mr. Narewski approved their payment (also in evidence); the only question, again, is whether those invoices falsely represent that AlfaModess did work for Catalent. To be clear, the question cannot be whether the *representations* (the invoices) are recalled with specificity, for the representations were, in fact, *indisputably* made. There is little reason to doubt the consistent testimony of the dock schedulers that Mr. Narewski instructed them to use East Coast as the freight broker. And the invoices from AlfaModess—especially on those exhibits that match AlfaModess and East Coast invoices—along with the parties' stipulation that East Coast was billing Catalent hundreds of times for freight brokerage, make clear that AlfaModess was merely regenerating East Coast invoices. The fact that all the dock schedulers remember calling East Coast and *not AlfaModess* (again, a negative that cannot be "remembered" "with specificity"), pursuant to Mr. Narewski's instructions to them, provides clear and convincing evidence of the Counterclaim and Third Party Defendants' fraud.

### But Catalent's Proof, Delivered Too Late, Is Spoiled

The Counterclaim and Third Party Defendants' fraud during the East Coast phase—i.e., up through March 2007—is not actionable, however, because Catalant's claims were not timely filed. Pennsylvania's statute of limitations for fraud is two years, 42 Pa. Cons. Stat. Ann § 5524(7), and Catalent filed its Counterclaim and Third Party Complaint on June 1, 2010 (Docket No. 25), well after March 2007, when East Coast was cut out and AlfaModess actually did become the house broker (whether the Defendants' actions in this time period were fraudulent is not an issue the Court needs to decide, for the reasons explained below).

Catalent asserts that its cause of action for fraud did not accrue until within the statute of limitations because "[u]nder the 'discovery rule,' the statute of limitations is tolled until a plaintiff 'knew or should have known on the exercise of reasonable diligence of his injury and its cause.'"[222] Catalent also asserts that the letter from East Coast's attorney accusing AlfaModess and Mr. Narewski of misconduct did not put it on notice of the Counterclaim and Third Party Defendants' fraud because, "ECTL's communications did not make any allegations of inflated freight invoices or any form of fraudulent billing conspiracy against Catalent between Odessa and Narewski."[223] Alternatively, Catalent asserts that its claims are timely because fraudulent concealment also tolls the statute of limitations.[224] Finally, Catalent asserts that "[b]ecause the fraud here was not one isolated act, but instead a series of continued actions as part of a conspiracy which continued into 2009, the third-party defendants' argument that the statute of limitations clock started in March 2007 must fail as a matter of law."[225] The Court must disagree.

While a party's failure to discover his injury may indeed toll the statute of limitations, the "question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, [the factfinder] is to decide it." *Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005). Moreover, although, "if through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry, the defendant is estopped from invoking the bar of limitation of action." *Ciccarelli v. Carey Can. Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir. 1985). "The standard of reasonable diligence . . . [also applies] when tolling takes place under the doctrine of fraudulent

---

[222] Catalent's Proposed Findings and Conclusions ¶ 204, at 63 (quoting *Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005)).

[223] Catalent's Proposed Findings and Conclusions ¶ 210, at 64.

[224] Catalent's Proposed Findings and Conclusions ¶¶ 218–28, at 66-67.

[225] Catalent's Proposed Findings and Conclusions ¶ 231, at 68.

concealment." *Fine*, 870 A.2d at 861; *accord, e.g.*, *Montañez v. Sec'y Pa. Dep't of Corr.*, --- F.3d ----, ----, No. 13-1380, 2014 WL 3953644, at *5 (3d Cir. Aug. 14, 2014). Further, "in order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff[] justifiably relied." *Lazarski v. Archdiocese of Phila.*, 926 A.2d 459, 465 (Pa. Super. Ct. 2007) (alteration in original). "Though the reasonable diligence test accounts for the different capacities of different plaintiffs, the test is nonetheless an objective one," *Perelman v. Perelman*, 545 F. App'x 142, 149 (3d Cir. 2013) (citing *Kach v. Hose*, 589 F.3d 626, 642 n.17 (3d Cir. 2009)), and although a fiduciary relationship "may suffice, in some circumstances, to 'trigger application of the discovery rule'" because it "may be 'pertinent to the question of when a plaintiff's duty to investigate arose,' the relationship is not dispositive." *Perelman*, 545 F. App'x at 150 (quoting *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 342-43 & n.11 (3d Cir. 2004) (internal quotation marks omitted)). "The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence." *Fine*, 870 A.2d at 860.

Here, although Mr. Narewski did attempt to conceal the Counterclaim and Third Party Defendants' fraudulent scheme, Catalent, through the exercise of reasonable diligence, should have seen through his efforts and discovered the fraud during its investigation of East Coast's allegations, and it can hardly prove otherwise by "clear, precise, and convincing evidence." The March 30, 2007 letter from East Coast's lawyer to Catalent's legal department, in the words of Mr. Krauss, Catalent's human resources director and an investigator, "rais[ed] some concerns that Steve Narewski . . . had basically pushed [East Coast] out of the business of transporting product, trucks in and out of our company, and he brought in a company called AlfaModess."[226]

---

[226] Day 2 Tr. N.T. 127:20–128:1 (Krauss direct).

The letter explicitly claimed that East Coast contracted with and provided transportation services for Catalent and accused Mr. Narewski of providing AlfaModess, which East Coast believed was auditing East Coast's invoices, with the identity of East Coast's truckers so that AlfaModess could take over East Coast's business with Catalent.[227] The letter also referenced a specific lunch between East Coast's president and Mr. Narewski for the discussion of East Coast's services for Catalent, and stated that Mr. Narewski had "acknowledged that ECTL had performed well for its 15 months of service for Cardinal, that ECTL rates were 'great' and there were no problems with the service," and that Mr. Narewski could provide no answer other than abruptly leaving the lunch, "[w]hen asked how AlfaModess could have contacted . . . ECTL truckers to take the business away from ECTL and why Cardinal [Catalent] would use AlfaModess."[228]

Even though East Coast's lawyers and other investigators took the accusations seriously enough to send letters back and forth regarding the threat of lawsuits, and even though Mr. Krauss was asked who Kathy Bannan and Mr. Ligato were, and even though Catalent decisionmakers considered firing Mr. Narewski because of his abrupt and insensitive interactions with staff, they nonetheless accepted Mr. Narewski's apparently otherwise unsupported version of events without adequate investigation and despite East Coast's allegations to the contrary. One particular incident with Mr. Narewski concerned email responses to Catalent's lawyers, Mikeisha Anderson and Jason Maxwell. Mr. Narewski "was, in [the investigators'] view, very disrespectful, very uncooperative, very defensive," such that the team was "a bit surprised by that initially. And then . . . suspicions started to grow" as to why Mr. Narewski was "being so defensive and uncooperative,"[229] because he had "an obligation as an employee of [Catalent] to

---

[227] P-14, at 1-2.

[228] P-14, at 1-2.

[229] Day 2 Tr. N.T. 136:16-25 (Krauss direct).

cooperate with the investigation."[230] Mr. Narewski responded to the lawyers' questions and document requests with defensive, angry responses such as, "I provided these documents before," and "How dare you ask me for them again";[231] he also refused to answer questions. Based on such exchanges, according to Mr. Krauss, several investigators "started to wonder what [was] going on back there and [whether] maybe there [was] some truth to East Coast's concerns."[232]

Nonetheless, the investigators stopped the inquiry there. East Coast's letter accused AlfaModess (by Mr. Kuri) and Mr. Narewski of wrongdoing, even if not of the precise fraud that was in fact occurring. Notwithstanding East Coast's naming Mr. Narewski and in spite of Mr. Narewski's own uncooperative, evasive, and rude behavior toward the Catalent investigators, the investigators elected to maintain an adversarial tone not so much with Mr. Narewski as with East Coast. Presumably, they never asked East Coast for all the hundreds of bills of lading and invoices East Coast had been sending Catalent directly, or if they did,[233] they unreasonably accepted Mr. Narewski's conclusory assertions that there was no contracting activity between Catalent and East Coast, and, rather, that AlfaModess was Catalent's broker.

As an objective matter, relying on Mr. Narewski's representations at this point, simply because he was the logistics supervisor, was patently unreasonable. All the investigators had to do was ask the dock schedulers what they knew, and they would have discovered the fraud. After all, Catalent relies primarily on those dock schedulers here in attempting to prove the fraud. Notwithstanding the fact that Mr. Krauss thought that he (and by implication, the investigating team) had performed his job "in a reasonable way based on the information [he] had," 153:24–

---

[230] Day 2 Tr. N.T. 136:25–137:3 (Krauss direct).

[231] Day 2 Tr. N.T. 130:13-14, 133:16-18, 138:13-22 (Krauss direct).

[232] Day 2 Tr. N.T. 138:24–139:1 (Krauss direct).

[233] *See supra* note 151 and accompanying text.

154:4 (Krauss cross (quotation from Mr. Cohen's question))**,** his saying it does not make it so.
Had Catalent's investigators exercised *reasonable* diligence, they should and would have
discovered Mr. Narewski and AlfaModess's fraud.

The gravamen of East Coast's March 30, 2007 letter is not so much that AlfaModess had
stolen East Coast's trade secrets (based, concededly, "upon information and belief"), as Catalent
attempts to characterize the letter, but, rather, that AlfaModess had, in allegedly stealing those
trade secrets, displaced East Coast as Catalent's house broker. And, in accusing AlfaModess, the
letter also explicitly charged Mr. Narewski with improper conduct, including by way of
recounting a specific episode: a lunch between East Coast's president, who clearly believed that
East Coast was Catalent's house broker, and Mr. Narewski, who "acknowledged that ECTL had
performed well *for its 15 months of service for Cardinal*" and "that *ECTL rates* were 'great.'"[234]
The letter clearly spelled out East Coast's demand that Catalent "restore ECTL's operations for
Cardinal."[235] At this point, thus, Catalent's investigators faced the mystery of whether East Coast
or AlfaModess had been Catalent's house broker, and whether Mr. Narewski was involved in
any wrongdoing.

But the investigators proceeded to ignore obvious inconsistencies and signs of
irregularity. They turned to Mr. Narewski who, after initially assuring them that East Coast's
account was inaccurate, became defensive and rude enough to raise suspicions. Mr. Narewski
also refused to answer a number of more specific questions posed by Catalent's lawyers. But
despite the lawyers and investigators' suspicions in response to Mr. Narewski's aggressive
responses, they relented—willing, apparently, to accept Mr. Narewski's representations for no
reason other than that he was the logistics supervisor. And yet, how does Catalent seek to prove

---

[234] P-14, at 2.

[235] P-14, at 2.

the fraud? Principally by testimony from all three of the dock schedulers that Mr. Narewski supervised, all of whom testified that, from January 2006 through March 2007, they placed orders with East Coast, not AlfaModess and that they had never heard of AlfaModess during that time period. If these employees are telling the truth today, one assumes that they would have given Catalent's investigators the same account had the investigators only asked. (Moreover, one would think that Mr. LaTorre, Mr. Narewski's supervisor, would have known which company was Catalent's house broker. It is not clear the extent to which he was consulted during the investigation or, if he was, whether he had a reasonable duty to know the information the investigators sought or should have discovered.[236])

So when Mr. Maxwell concluded the investigation with the assertion, in his August 28, 2007 letter to East Coast's attorney, that Catalent *employees* had repeatedly instructed that East Coast send invoices to AlfaModess, which employees, other than Mr. Narewski, could Mr. Maxwell have been referring to? The dock schedulers presumably would have told Mr. Maxwell (had they been asked) that Mr. Narewski himself instructed them to use East Coast as the house broker until, in March 2007, Mr. Narewski changed the house broker to AlfaModess. East Coast's letter, although slightly inaccurate, offered one potential explanation of AlfaModess's involvement—that AlfaModess "audited ECTL freight bills of ECTL to Cardinal [Catalent]," and that AlfaModess's "broker authority . . . was not known to ECTL when it submitted its bills to Cardinal [Catalent], nor did Mr. Narowski advise ECTL of same." Why would this assertion matter? Not because what East Coast thought mattered or matters per se, but because cobrokering, though not unheard of, is not something to make a *practice* of. The investigators clearly could not rely on Mr. Narewski, as later became abundantly clear, but *his* supervisor, Mr.

---

[236] *See also supra* note 220 and accompanying text.

LaTorre, if reasonably informed, would have had every reason to question why, if East Coast was a "subcontractor" for AlfaModess—i.e., a broker for a broker—that was nonetheless sending invoices directly to Catalent *hundreds of times*, Catalent was *not* doing business directly with East Coast and instead paying AlfaModess for doing almost nothing. Moreover, although it is somewhat unclear whether the investigators had access to East Coast's own invoices, but they could have obtained them (from East Coast, for example), and, if they had, they should have wondered why AlfaModess was, in essence, doing nothing more than reproducing the invoice at a substantially inflated price.

"The 'discovery rule' . . . arises from the *inability* of the injured, *despite the exercise of due diligence*, to know of the injury or its cause," *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa.1983) (emphasis in original), and "[t]he doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim," *Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir. 1993), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998). In short, through a reasonable inquiry, on which they were on notice to conduct, Catalent's investigators would have discovered all the evidence that Catalent now relies on as sufficient to prove Narewski, Odessa, and AlfaModess's fraud. And this conclusion is not Monday morning quarterbacking. In response to Narewski's intransigence, following accusations that *he* had engaged in wrongdoing, Catalent's lawyers simply turned away. They did not press for answers to their questions. They did not ask the employees Mr. Narewski supervised what their version of events was. Nor, apparently, did they ask such questions of East Coast, which was clearly billing less than AlfaModess was for the same transactions. Did the investigators even ask Mr. Narewski's boss, Mr. LaTorre, if *he* knew

who Catalant's house broker was? Did the investigators ask Mr. Narewski for—and if they asked for it, did they truly pursue it—documentation of Catalent's relationship with AlfaModess? Did they examine bills of lading, which listed East Coast, rather than AlfaModess, as the house "carrier"? Though Mr. Narewski's fraudulent concealment was effective, it should not have been.

Pennsylvania's statute of limitations also bars Catalent's actions for conversion, *see* 42 Pa. Cons. Stat. § 5524(3), (7); *see also, e.g.*, *Menichini v. Grant*, 995 F.2d 1224, 1229 & n.6 (3d Cir. 1993); *Bednar v. Marino*, 646 A.2d 573, 578 (Pa. Super. Ct. 1994), conspiracy, *see, e.g.*, *Harris v. Homecomings Fin. Servs., Inc./Bank One*, 377 F. App'x 240, 244 (3d Cir. 2010) ("Pennsylvania has a two-year limitation period for fraud (and conspiracy to commit fraud) claims under 42 Pa. Cons. Stat. Ann. § 5524(7)."); *cf. also, e.g.*, *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir.1999) ("The established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability."), and aiding and abetting, *cf., e.g.*, *Pierce v. Rossetta Corp.*, No. 88-5873, 1992 WL 165817, at *10 (E.D. Pa. June 12, 1992) ("The Court predicts that the Pennsylvania Supreme Court would apply the 2 year statute of limitations found in 42 Pa. Cons. Stat. Ann. § 5524(7) to the aiding and abetting claim because it involves the breach of a fiduciary duty and a breach of fiduciary duty claim has typically been subject to a two-year statute of limitations.").[237]

---

[237] The changing nature of the fraud, if what followed the scheme involving East Coast was in fact also fraud, also offers one answer Catalent's contention that the statute of limitations does not begin to run until "the last overt act committed in furtherance of the fraudulent conspiracy," or "the mailing of the last fraudulent invoice by AlfaModess in January of 2009, which is within two years of when Catalent filed suit." Catalent's Proposed Findings and Conclusions ¶ 230, at 68.

For one, even if the Court assumes that some unlawful "continuing scheme" tolls the statute of limitations, AlfaModess's fraud in claiming to be doing East Coast's work does not constitute the same "scheme" as AlfaModess's actual work for Catalent thereafter. Thus, even if Catalent's behavior after the East Coast phase was fraudulent—an issue unnecessary, for the following

reasons, to reach—such fraud would not allow Catalent to reach back into the East Coast phase to avoid the statute of limitations defense.

Second, and relatedly, even if such a doctrine applied, it would only allow recovery for the behavior within the statutory period. Catalent cites *Borough of Shippensburg v. Kelley*, 4 Pa. D. & C.5th 208 (Ct. Com. Pl. 2006), for the proposition that "[w]here there are repetitive acts committed as part of a continuing conspiracy, the statute of limitations does not begin to run until after the commission of the last overt act in furtherance of the conspiracy." *Id.* at 217. This statement is either incomplete or inaccurate. The *Kelley* court cited another rather conclusory statement of law in *Baker v. Rangos*, 324 A.2d 498, 509-10 (Pa. Super. Ct. 1974), a decision that in turn relied on a *criminal* case, *Commonwealth v. Fabrizio*, 176 A.2d 142 (1961), that, in turn stated that

> where there are continuous and repetitious overt acts or trespasses as a part of a continuing conspiracy, it has been held that the statute of limitations does not begin to run until after the commission of the last act of the conspiracy. . . . *The indictment must charge the offense to have been committed on a day certain within the statutory period.*

*Fabrizio*, 176 A.2d at 147-48 (emphasis added). The implicit reasoning does not transfer to a civil case: a crime committed within the statute of limitations is still crime, whether other related criminal acts occurred earlier, but that reasoning does not mean that damages that occurred outside the statutory period are chargeable as if they were in the statutory period.

In fact, the general "separate accrual" rule is that "when a defendant commits successive violations, the statute of limitations runs separately from each violation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 (2014); *but see id.* at 1969 n.6. Catalent would have to show much, by way of legal argument, to establish that AlfaModess's fraud regarding East Coast can be considered "an unlawful practice that continues into the limitations period, [such that] the complaint is timely when it is filed within [the statutory period from] the last asserted occurrence of that practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) (footnote omitted). In other words, it is unclear whether AlfaModess's fraudulent "scheme" can, in fact, be conceptualized for these purposes as one continuing violation. *Cf. generally, e.g.*, Jeffrey R. Boles, *Easing the Tension Between Statutes of Limitations and the Continuing Offense Doctrine*, 7 Nw. J.L. & Soc. Pol'y 219, 235 (2012) ("Contemporary courts have applied the doctrine unevenly, however, because they often have struggled deciding whether a particular crime is a continuing offense."). In any event, as stated above, the Court need not enter that thorny thicket because whatever the nature of the scheme, it changed in March 2007.

A third and final reason not to apply a "continuing violations" doctrine here is that, as set out above the line, Catalent should have discovered AlfaModess's course of fraud. If Catalent's failure to do so could be so easily cured by application of a "continuing violations" doctrine, not only would general statute of limitations principles be eviscerated, but so, too, would be rendered nugatory "one of the overarching tenets in this area of our jurisprudence—the responsibility of a party who seeks to assert a cause of action against another to be reasonably diligent in informing himself of the facts upon which his recovery may be based," *Fine*, 870 A.2d at 861. This principle, of course, vindicates the concern that "[c]ivilization must protect itself from the sluggard, as well as from the evildoer," because "[t]he lazy railroad watchman, who fails to

### *Changing Fraud, the Bungled Investigation, and Their Effect*

AlfaModess's pretending to be Catalent's house broker was, as described above, fraud in the factum that, were it not for the statute of limitations, would render any purported contractual arrangement between Catalent and AlfaModess void, as if it never occurred. *See supra* note 221 and accompanying text. Of course, as discussed below, AlfaModess and Catalent had no contract at all when East Coast was performing services for Catalent.

But the consequence of Catalent's switching brokers, such that AlfaModess actually was performing brokerage services for Catalent between March 2007 and April 2008, means that AlfaModess's fraud after that point, if it can be proven, is really in the nature of fraud in the inducement, *see supra* note 221 and accompanying text: the contention regarding this later phase is that AlfaModess, Mr. Odessa, and, particularly, Mr. Narewski failed to disclose to Catalent key facts about AlfaModess and Mr. Narewski's relationship with Mr. Odessa.[238] But Catalent can no longer prove fraud after 2007: for all the reasons discussed above, Catalent could no longer reasonably rely on Mr. Narewski's or AlfaModess's representations. The investigation that should have been performed should not only have discovered Mr. Narewski's fraudulent behavior, but also, therefore, AlfaModess's, and, one suspects, Catalent would have ceased working with AlfaModess immediately. Moreover, the harm proximately caused by any reliance

---

lower a safety gate in time, can inflict as much harm on innocent passengers as the bandit who holds up the train." *Turtzo v. Boyer*, 88 A.2d 884, 886 (Pa. 1952).

In any event, the only reason a determination of whether AlfaModess committed any fraud after March 2007 remains relevant is that Catalent might hope that a finding of fraud would allow it to avoid the relatively small amount of payments it made to AlfaModess after the East Coast–related fraud. And, for the reasons described above, Catalent has not proven such fraud because it has not proven that its continuing reliance was reasonable.

[238] Pennsylvania law mandates that "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. Ct. 2004) (quoting *McKeeman v. Corestates Bank*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000)). The same logic would seem to apply to aiding and abetting.

on Mr. Narewski's omissions about the true nature of AlfaModess and his relationship with Mr. Odessa in truth resulted from the hugely inflated prices AlfaModess was charging as it was passing along the actual brokerage work to other brokers, mainly C.H. Robinson. Catalent had every opportunity, and indeed was on notice, to discover the insanity of these prices—whether because someone should have been auditing prices all along (someone in accounting, or Mr. LaTorre), or, even more damningly, because Catalant could have obtained and compared East Coast's invoices with AlfaModess's and learned that, *even if* AlfaModess *had* been its broker during the East Coast phase, it was serving no useful purpose other than draining Catalent's funds.

In any event, for the following reasons, even if the Court were to find that Catalent could avoid any of the implied contracts AlfaModess contends are breached, the numerical bottom line would be no different because the parties failed to agree on a price term. "A contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in the light of the surrounding circumstances." *Elias v. Elias*, 237 A.2d 215, 217 (Pa. 1968). By Mr. Kuri's admission[239] (and in one of Mr. Odessa's inconsistent statements[240]), AlfaModess did not quote price terms. While the parties' "intentions to enter into the contract and the attendant obligations are easily inferred from the surrounding circumstances," *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 659 (Pa. 2009), "in order for there to be an enforceable

---

[239] *See supra* notes 98–99 and accompanying text.

[240] *See, e.g.*, Day 1 PM Tr. N.T. 73:17-25 (Odessa cross) (Mr. Cohen: "And when they called you and they wanted to move freight or have freight moved, did you quote them a rate for the freight transportation services?" Mr. Odessa: "Usually ask about quote, of course, I provide quote." Mr. Cohen: "Do you remember quoting a rate to any of these unnamed people that called from Catalent from January of 2006 through March of 2007?" Mr. Odessa: "Not exactly. I don't recall.").

contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain," *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956). Price is obviously an essential term, *e.g.*, *Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super. Ct. 2006), and here, it was not "sufficiently definite." *See, e.g.*, *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 585 (3d Cir. 2009) ("Whether the terms are sufficiently definite is a question of law."). Nor did the parties "agree[] upon a practicable method of determining the price in the contract with reasonable certainty, such as through a market standard." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 238 (E.D. Pa. 2007); *see Zvonik v. Zvonik*, 435 A.2d 1236, 1244 (Pa. Super. Ct. 1981). In fact, a great many invoices were many months after the services had been provided.[241] The parties' contract fails as unenforceable.

AlfaModess's arguments to the contrary are unavailing. No "course of dealing" is available to AlfaModess, because that course of dealing was a course of fraud, and whatever may be said about the application of the statute of limitations to Catalent's fraud action, proof of the fraud prohibits AlfaModess from claiming a course of prior contracts with Catalent—there is no "several-year history of [the parties] doing business together."[242] *Cf., e.g.*, *Butyl v. Goldfinch*, 133 P. 1057, 1060 (Wash. 1913) ("Actions are barred, but defenses are not." (quoting *Robinson v. Glass*, 94 Ind. 211, 216 (1884))). (Furthermore, for shipments marked collect, the Court agrees with Catalent's contention that any payments tendered by Catalent were a gratuitous gesture; payments on behalf of another fall under the statute of frauds and all essential terms must be in writing. *See, e.g.*, *Target Sportswear, Inc. v. Clearfield Found.*, 474 A.2d 1142, 1148 (Pa. Super. Ct. 1984).) Nor, even if a contract was formed, could AlfaModess prove its damages, because it cannot prove that the damages it claims "(1) . . . were such as would naturally and ordinarily

---

[241] *See, e.g.*, *supra* note 220 and accompanying text.

[242] AlfaModess's Proposed Findings and Conclusions ¶ 4, at 13.

result from the breach, or (2) . . . were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) [that] they can be proved with reasonable certainty." *Ferrer v. Trustees of Univ. of Pa.*, 825 A.2d 591, 610 (Pa. 2002) (quoting *Taylor v. Kaufhold*, 84 A.2d 347, 351 (1951)). For one, a significant number of the outgoing bills of lading are marked "collect," with the meaning, in normal trade usage (as admitted by Mr. Kuri), that the recipient (rather than Catalent, that is) was intended to pay for the freight transportation. Second, AlfaModess did not show that it actually paid the brokers it turned to. Mr. Odessa's testimony and self-produced exhibit (with no corroboration) are insufficient.

Still, it would be unjust for Catalent to have benefited from AlfaModess's services, however paltry they may have been, without tendering payment. Unjust enrichment is the focus of the next section.

### But All Is Not Lost

Catalent can still recover, however, on its claim of unjust enrichment, because that cause of action has a four-year statute of limitations, 42 Pa. Cons. Stat. Ann. § 5525(a)(4); *e.g.*, *Kliesh v. Select Portfolio Servicing, Inc.*, 527 F. App'x 102, 104 (3d Cir. 2013); *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997), or more than long enough for Catalent's purposes (and the Defendants do not raise a statute of limitations defense to Catalent's unjust enrichment claim). And AlfaModess, for is part, is not entirely without recourse, for it, too, can recover under the unjust enrichment paradigm.

To prevail on a claim for unjust enrichment under Pennsylvania law, a plaintiff must prove "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it

would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999). AlfaModess argues that the question is not the intent of the parties, but rather "whether the defendant has been unjustly enriched," *id.*; *see, e.g.*, *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 445 (E.D. Pa. 2013), but this contention is not entirely true, because the rule is broader: it does not *require* wrongful intent, but a party's wrongful intent, of course, may render that party's retention of a benefit "unconscionable." *E.g.*, *Gee v. Eberle*, 420 A.2d 1050, 1059 (Pa. Super. Ct. 1980). A more complete statement of the unjust enrichment rule, therefore, is that the proponent of the claim must show that its adversary "*wrongly secured* or passively received a benefit that it would be unconscionable to retain." *Martin v. Little, Brown & Co.*, 450 A.2d 984, 988 (Pa. Super. Ct. 1981) (emphasis added); *accord, e.g.*, *Crossgates Realty, Inc. v. Moore*, , 420 A.2d 1125, 1127-28 (Pa. Super. Ct. 1980); *see also, e.g.*, *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328-29 (Pa. Super. Ct. 1995) ("The most important factor to be considered in applying the doctrine is whether the enrichment of the defendant is *unjust*."). Such unconscionability is clearly shown where the one party defrauded another, as here. *Cf., e.g.*, *Restatement (First) of Restitution* § 1 cmt. d (1937) ("[W]here a person is induced by the fraud of another to make a gratuitous conveyance of land to him, the transferee would be unjustly enriched and the transferor unjustly deprived of the property if the transferee were permitted to keep it; in such case the transferor can charge the transferee as constructive trustee of the land for him, and compel him to retransfer the land.").

That the statute of limitations has run on the fraud claim presents no obstacle to Catalent. Although an action for unjust enrichment may not proceed where the relationship between the parties is governed by a contract, *e.g.*, *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448

(Pa. 1969) ("[T]he quasi-contractual doctrine of unjust enrichment inapplicable when the relationship between parties is founded on a written agreement or express contract."); *Gee v. Eberle*, 420 A.2d 1050, 1060 (Pa. Super. Ct. 1980); *Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 & n.8 (3d Cir. 2014), no contract existed between AlfaModess and Catalent for the freight transportation services provided by East Coast. This conclusion does not rest on the fact that fraud in the factum renders a contract void ab initio, *see, e.g.*, *Restatement (Second) of Contracts* § 163 cmt. c; *Langley*, 484 U.S. at 93-94; *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 109-10 (3d Cir. 2000); it could not, because the two year-statute of limitations, 42 Pa. Cons. Stat. Ann. § 5524, has run. Rather, no contract exists because AlfaModess did nothing at all for Catalent other than fraudulently claim credit for having delivered services it did not perform. In representing that it had done work for Catalent, AlfaModess did not agree, explicitly or implicitly, to anything.[243]

  The Court concludes that it would be inequitable for AlfaModess to retain the benefit of the payments AlfaModess made to it for work performed by East Coast, and will therefore award AlfaModess the $794,018 Catalent paid AlfaModess beyond the money AlfaModess remitted to East Coast.[244] (Catalent will not recover money it paid to AlfaModess for work (actually)

---

[243] Nor does the gist of the action doctrine bar Catalent's unjust enrichment claim. *See, e.g.*, *Integrated Waste Solutions, Inc. v. Goverdhanam*, No. 10-2155, 2010 WL 4910176, at *15 (E.D. Pa. Nov. 30, 2010) ("The gist of the action doctrine does not apply to causes of actions based upon implied or constructive contracts."); *Mellon Bank v. Maris Equip. Co.*, 53 Pa. D. & C.4th 209, at *6 (Com. Pl. 2000); *cf., e.g.*, *Sevast v. Kakouras*, 915 A.2d 1147, 1154 n.7 (Pa. 2007); *Schott*, 259 A.2d at 449 ("Quasi-contracts may be found in the absence of any expression of assent by the party to be charged and may indeed be found in spite of the party's contrary intention."); *UFE Inc. v. Methode Elecs.*, Inc., 808 F. Supp. 1407, 1416 (D. Minn. 1992) ("An action for unjust enrichment may be founded on a failure of consideration, *fraud*, mistake, and in other situations where it would be morally wrong for one party to enrich himself at the expense of another." (emphasis added) (internal quotation marks and citation omitted) (Minnesota law)).

[244] *See supra* notes 124–127 and accompanying text. Fraud and unjust enrichment also focus on different issues and, accordingly, provide for different types of relief. For instance, the fact

performed after March 2007, because, by paying AlfaModess, Catalent performed a contract with a specific price term, even if AlfaModess requested that rate after the performance.). Mr. Odessa is not personally liable for this amount, however, because Catalent has neither produced evidence regarding how Mr. Odessa was "personally unjustly enriched," *e.g.*, *L.R. McCoy & Co., Inc. v. Beiler*, No. 10-1301, 2011 WL 925410, at *7 (E.D. Pa. Mar. 16, 2011), nor sought to pierce the corporate veil.

AlfaModess will also recover on its unjust enrichment claim. Just as in a contract action, an unjust enrichment plaintiff "has the burden of proving damages to a reasonable degree of certainty." *E.g.*, *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 510 (Pa. Super. Ct. 2003). Although it did very little useful work in cobrokering loads for Catalent (which should have gone directly to C.H. Robinson, for instance), and made no effort to prove the "reasonable value" of its services, *id.* The Court finds that a 5% markup based on the cobroker's rate, or $19,366, is the "reasonable value" of AlfaModess's services and, thus, the amount to which AlfaModess is entitled.[245] As noted above, AlfaModess has not proven that it paid the brokers on Catalent's behalf, and even if it could, it has not proven that shipments marked "collect" are payable by Catalent—the benefit accrued as much to the recipient as to the shipper, and even Mr. Odessa himself testified that the use of the word "collect" on a bill of lading "removes the[ shipper's] responsibility [for] paying for this transportation and puts [the] obligation to pay this to [the] receiving party."[246] Thus, the Court finds that AlfaModess has not

---

that wrongful intent is not a requirement also means that punitive damages are not available under the unjust enrichment rubric. *E.g.*, *Williamsburg Commons Condo. Ass'n v. State Farm Fire & Cas. Co.*, 907 F. Supp. 2d 673, 680 n.7 (E.D. Pa. 2012); *Sunburst Paper, LLC v. Keating Fibre Int'l, Inc.*, No. 06-3959, 2006 WL 3097771, at *4 (E.D. Pa. Oct. 30, 2006).

[245] *See supra* notes 172–173 and accompanying text.

[246] Day 1 PM, 9:16-19.

proven that Catalent was unjustly enriched, at AlfaModess's expense, by payments allegedly made on Catalent's behalf to AlfaModess's cobrokers.

### *Irony*

Finally, AlfaModess's claim of fraud must be summarily denied. Mr. LaTorre's April 22, 2008 letter to Mr. Kuri contains no misrepresentation. It states that Catalent "will assist AlfaModess in collecting the said transportation fees *when appropriate*," among other language disclaiming clear agreement that AlfaModess's invoices were collectable as billed.[247] In fact, in Mr. Kuri's understanding, Mr. LaTorre, in the April 22, 2008 letter, "did not promise" to make Catalent's customers pay AlfaModess for collect charges; rather, "he just sent [AlfaModess] to their [Catalent's] clients to collect."[248] Nor did AlfaModess actually rely on the representation, let alone reasonably rely, to its detriment: AlfaModess does not claim that it incurred costs or sustained harm as a result of AlfaModess's letter. Any alleged harm flows, rather, from the refusal of Catalent's customers, and Catalent, to pay, not any reliance on the part of AlfaModess. Without anything remotely resembling "clear and convincing evidence" of a false representation, proof of Catalent's "intent of misleading" AlfaModess, and "injury proximately caused by the reliance," *Porreco*, 811 A.2d at 570-71 (Pa. 2002), AlfaModess cannot prevail on its fraud claim.

---

[247] P-8.

[248] Day 1 AM Tr. N.T. 104:4-15 (Kuri cross).

**CONCLUSION**

The Court finds that AlfaModess is liable in unjust enrichment to Catalent in the amount of $794,018 and Catalent to AlfaModess in the amount of $19,366, for a net liability of AlfaModess to Catalent of $774,652.

A consistent Order of Judgment follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge